# SUPREME JUDICIAL COURT

##### AT THE

## MARCH SESSION 1868, IN BOSTON.

###### PRESENT .

Hon. REUBEN A. CHAPMAN, Chief Justice.
Hon. EBENEZER R. HOAR,
Hon. HORACE GRAY, Jr.,
Hon. JOHN WELLS, } Justices.
Hon. JAMES D. COLT,

---

## Commonwealth *vs.* Daniel W. Larrabee & another.

The provision of the Gen. Sts. c. 115, § 5, that "the courts shall not charge juries with respect to matters of fact, but may state the testimony and the law," does not restrain a judge from defining, in a charge to the jury, the degree of weight which the law attaches to a whole class of testimony, such as the testimony of accomplices, and leaving to the jury the application of the general rule to the circumstances of the case on trial; nor deprive the defendant of his right of exception, if the judge charges the jury that testimony of an accomplice against the defendant is corroborated by evidence which by the rules of law has not that effect.

On the trial of a criminal case, the judge, in charging the jury, recited evidence introduced by the Commonwealth to corroborate the testimony of an accomplice, and said that if the jury believed the witnesses there was such corroboration. *Held,* that the reasonable interpretation of this instruction was, not merely that the whole testimony of all the other witnesses, taken together, amounted to a corroboration of the accomplice, but that the testimony of each of them, taken by itself or with the aid of such other evidence only as was avowedly introduced in connection with it, was corroborative evidence.

On the trial of an indictment for larceny, the principal witness for the Commonwealth was an accomplice in the theft, who testified that on the morning before committing it he walked some distance (in part on a railroad, where he met M.,) to meet the two defendants by appointment; that then they three drove with a horse and wagon to a village whe~

the defendants left him to buy luncheon; that he walked after them, and found them waiting for him and talking with a man whom he had seen in court; that then they three drove on further, and called at two houses for water, which he obtained at one from a woman, and at the other from a girl, both of whom he saw a few days before the trial, when taken by an officer to see them; and that then they waited until night, when they committed the larceny. To corroborate him, the Commonwealth called a witness who testified that, at some time during the month of the larceny, he saw such a horse and wagon standing on the road in that village, with two men in the wagon, and had some talk with the men, such as was stated by the accomplice, during which a third man came with a lunch, of which the three partook. The witness professed himself unable to identify either of the three men; but the judge admitted his testimony in connection with that of a woman and her daughter, and of two girls, who lived in neighboring houses situated substantially as described by the accomplice, (but at a distance of several miles from the place described by the previous witness,) all of whom identified the accomplice and the defendants as having called at their houses with such a horse and wagon, and obtained water, the day preceding the larceny. The defendants, testifying in their own behalf, denied ever having seen the witness who met the three men on the highway, or either of the female witnesses, denied also the whole story of the accomplice, and said that on the day preceding the larceny he came to them, at a place different from that named by him, and borrowed their horse and wagon, about ten o'clock before noon, which was inconsistent with his statement of the time when he met M. on the railroad. The Commonwealth, thereupon, to contradict the defendants, and corroborate the accomplice, called M. as a witness, who testified that one day in one of two months (one of them being the month of the larceny) he met the accomplice at the place described by him on the railroad, at an hour which the witness thought was about the middle of the forenoon. *Held*, that the accomplice was corroborated by the testimony of each of the other witnesses called by the Commonwealth, taken by itself or with the aid of such other evidence as was avowedly introduced in connection with it.

INDICTMENT for larceny of a horse. At the trial in the superior court, before *Reed*, J., the principal witness for the Commonwealth was Samuel Stone, who had been indicted as an accomplice with the defendants in the larceny. Other witnesses were Charles McIntire, Mrs. Blunt and her daughter, and two girls named Upton. There were witnesses also whose names were not stated in the bill of exceptions; and after the defendants had testified in their own behalf the attorney for the Commonwealth called Isaac Munroe as a witness in reply. There was also testimony relating to one Lapham and one Marshall, admitted to disprove any theory that they, and not the defendants, were companions with Stone in committing the larceny; which is immaterial. The substance of all the material testimony is stated in the opinion. The judge instructed the jury "that although he could not say to them that they could not convict upon the uncorroborated testimony of an accomplice, yet it was

**not** safe for them to do so; and that, before considering the testimony of Stone, they ought to see whether he was corroborated; that it was not necessary for his whole story to be corroborated, but that corroboration in some one material particular was sufficient." He further "recited the testimony which the government relied on as such corroboration, and among the rest that of McIntire and Munroe, and said to the jury that if they believed the witnesses then there was such corroboration." And he refused to make any modification of these instructions. The jury returned a verdict of guilty; and the defendants alleged exceptions.

*S. B. Ives, Jr., & J. L. Stackpole,* for the defendants.

*C. Allen,* Attorney General, for the Commonwealth.

GRAY, J. The testimony of accomplices is competent, and often necessary, to prove the commission of a crime. But, as it involves a confession of participation by the witness in the guilt charged, and is liable to be exaggerated from hope of pardon or fear of punishment, the law views it with peculiar suspicion; and it is usual to instruct the jury, as was done in this case, that it is unsafe to convict upon such evidence, unless corroborated in some material particular. This is said in some of the English cases to be rather a rule of practice than a rule of law; but the statement of Lord Abinger in *Regina* v. *Farler,* 8 C. & P. 107, that " it is a practice which deserves all the reverence of law," has been often quoted with approval. Still, as the law, while holding such evidence to be of inferior quality, does not wholly exclude it, its effect in each case must finally be determined by the jury; and therefore, if the judge calls their attention to its suspicious character and need of corroboration, no exception lies to his refusal to direct them to acquit the prisoner if it is not corroborated, or to his instructing them that they may convict upon the uncorroborated testimony of an accomplice if it satisfies them beyond a reasonable doubt of the guilt of the defendant. But if evidence is submitted to the jury as corroborative, which is not legally such, the error may be revised by bill of exceptions. *Commonwealth* v. *Bosworth,* 22 Pick. 397. *Commonwealth* v. *Desmond,* 5 Gray, 80. *Commonwealth*

v. *Brooks,* 9 Gray, 299. *Commonwealth* v. *Price,* 10 Gray, 472. *Simmons* v. *Simmons,* 1 Rob. Eccl. 575, and 5 Notes of Cases, 344. *Regina* v. *Stubbs,* 7 Cox Crim. Cas. 48, and Dearsly, 555 3 Russell on Crimes, (4th Eng. ed.) 961–968. 1 Greenl. Ev. §§ 380, 381.

It was argued by the attorney general, that the Gen. Sts. *c.* 115, § 5, having provided that "the courts shall not charge juries with respect to matters of fact, but may state the testimony and the law," a judge has now no authority in this Commonwealth to advise the jury as to the weight to be allowed to the testimony of an accomplice, and that the defendants in this case have therefore no ground of exception to the instructions given. But the answer to this is twofold. In the first place, the statute referred to, while it restrains the judge from expressing an opinion upon the credibility of particular witnesses, does not preclude him from defining the degree of weight which the law attaches to a whole class of testimony, leaving it to the jury to apply the general rule to the circumstances of the case. *Commonwealth* v. *Barry,* 9 Allen, 276. And in the next place, if the judge had exceeded the limit fixed by the statute in this respect, it would not deprive the defendant of his right of exception to further instructions attributing to the testimony a weight to which it was not by law entitled, as would be the case if he should instruct the jury that the testimony of an accomplice was corroborated, when the other evidence introduced for the purpose of corroboration had not by the rules of law that effect.

The presiding judge in this case, as the bill of exceptions states, " recited the testimony which the government relied upon as such corroboration, and among the rest that of McIntire and Munroe, and said to the jury that if they believed the witnesses then there was such corroboration." The reasonable interpretation of this instruction, in our opinion, is, not merely that the whole testimony of all the other witnesses, taken together amounted to a corroboration of the accomplice, but that the testimony of each of the witnesses called to corroborate him, taken by itself, or with the aid of such other evidence only as

was avowedly introduced in connection with it, was corrobo‑ rative evidence.

In order to determine whether there was any error in this instruction, it is therefore necessary to analyze the testimony of the accomplice and the evidence relied on by way of cor‑ roboration.

Stone, the accomplice, testified at the trial that the two de‑ fendants had previously agreed to meet him on the 23d of July with their horse and wagon at the Wilkins Farm, a place be‑ tween South Danvers and Reading; that he on that day walked from South Danvers up the Lowell Railroad, (upon which he met and conversed with Isaac Munroe,) and thence up the high‑ way to the rendezvous, and there found the defendants waiting for him, and they drove together towards Andover through Mid‑ dleton, where he got out of the wagon and bought some lunch‑ eon in a shop, while the defendants drove on out of the village; that he walked after them, and found them waiting for him and talking with a man whom he had since seen in court; that they three drove on, and called at two farm-houses for water, which he obtained at one house from a woman, and at another from a little girl, both of whom he saw the Saturday before the trial, when he was taken by an officer to see them; that the three waited until night and then stole two horses out of a pasture and led them to Brighton, where they arrived about daylight and sold them on the 24th.

Charles McIntire testified that on some day in July he saw a horse and wagon (his description of which was a correct descrip‑ tion of the defendants' horse and wagon) standing on the road in Middleton, with two men sitting in the wagon, and had some talk with them, (which he stated substantially as detailed by Stone,) and while they were talking a third man came up, bringing some crackers and cheese, of which all three partook. McIntire professed himself unable to identify the persons, and his testimony was objected to by the defendants on that ground, and was admitted by the court upon the statement of the dis‑ trict attorney that he proposed to identify them by witnesses who saw them further along the road. Mrs. Blunt and her

daughter, and two girls named Upton, (who resided in Andover in two houses not far apart, situated substantially as stated by Stone, and several miles from the place described by McIntire,) testified that three men, whom they positively identified as Stone and the defendants, called in a wagon at their houses and obtained water on the 23d of July; and gave a similar description of their horse and wagon to that which McIntire had given. There was also evidence from other witnesses, (which does not appear to have been objected to, and as to which no argument has been addressed to us,) identifying the defendants as having been at Brighton with Stone on the 24th, with these horses in the possession of one of them.

The fact to be proved was, that the defendants and Stone stole the horses in Andover on the night of the 23d. The evidence last mentioned tended to show that they were in Brighton with the horses on the 24th. The testimony of McIntire, taken together with that of the Blunts and Uptons, (in connection with which it had been admitted,) tended to show that on the 23d they drove together in apparent intimacy several miles towards Andover. All this testimony corresponded with Stone's, and tended materially to corroborate him. It is not to be expected that each witness will be able to prove the connection of the accused with the accomplice throughout the whole criminal transaction. It is enough if the testimony of each witness proves joint action at any stage, and that it all tends to show the participation of the accused in the crime charged. Authorities above cited. *People* v. *Davis*, 21 Wend. 309.

The defendants denied the truth of Stone's whole story, and offered much testimony tending to prove that they were both in South Danvers during the whole of the 23d of July and the succeeding night. They testified that Stone borrowed the horse and wagon two days before, saying that he would come for it on that day, for the purpose of going after a horse which he had bought; that he did come about ten o'clock in the morning, and took the horse and wagon from the house of one of them more than a mile from the Wilkins Farm, and at such a time as was inconsistent with Stone's statement of the time when he met

Munroe; that the defendants did not go to Middleton or North Andover, never saw McIntire, the Blunts or the Uptons, and had no knowledge of the larceny; that, becoming uneasy about the continued absence of Stone, they borrowed a horse and wagon of the father of one of them, and on the 24th drove to Brighton, and there found Stone with their horse and wagon, and the two stolen horses, which he said he had bought, and which one of the defendants at Stone's request then led to the auction stable and left there, and the defendants took their horse and wagon and drove home.

The district attorney, in reply, called Munroe, who was permitted, against the defendants' objection, and for the purpose of contradicting the defendants' testimony that Stone called at their house for the horse and wagon on the morning of the 23d of July, to testify that he remembered meeting Stone on some day in July or August (which he could not fix more definitely) and as he thought about the middle of the forenoon, on the Lowell Railroad, substantially in the place described by Stone. In the aspect of the case at the time when this testimony was offered, after the defendants had introduced their own and other testimony to disprove the truth of the whole of Stone's evidence, this testimony of Munroe tended to corroborate Stone in a particular which went to show the falsehood of the defendants' own testimony, and indeed of their entire defence; which was a most material particular directly tending to prove their guilt. *Commonwealth* v. *O'Brien*, 12 Allen, 183. *People* v. *Dyle*, 21 N. Y. 578. If previous testimony had precisely fixed the day, it is hardly denied that it would have been admissible. Its indefiniteness in this respect might affect its weight, but not its competency to be submitted to the jury, who were the proper judges whether the day was identified. *Commonwealth* v. *Annis*, 15 Gray, 197.

The evidence as to Lapham and Marshall was manifestly not part of the testimony upon which the Commonwealth relied by way of corroboration of Stone, and was therefore not embraced within the ruling excepted to. *Exceptions overruled.*