## COMMONWEALTH *vs.* ROBERT SCOTT & another.

Hampshire.    October 5. — 19, 1877.    ENDICOTT & LORD, JJ., absent.

In a criminal case, the court may, at the request of the district attorney, appoint other counsel to assist him at the trial, if the interests of public justice seem to require it, and such counsel acts without any assurance or expectation of compensation from any private person.

A bill of exceptions, to the appointment of counsel in a criminal case to assist the district attorney, showed that there was evidence that the counsel stated to the court that he was present simply by procurement of the district attorney, without any assurance or expectation of compensation from any private source, and that he would be as free to act impartially as when he was district attorney; that he was first applied to by the counsel for a private party interested in the result of the trial, and afterwards by the district attorney; and, when asked whether he stood in such circumstances that he could possibly receive a present from the private party, replied facetiously that he should not care to have his virtue put to any very strong test. *Held*, that no error appeared in the decision of the judge, appointing him to act.

A defendant in a criminal case, not under oath as a witness, is not entitled to repeat something in the presence of the jury, to rebut evidence of a witness for the government, who testified that he identified the defendant by his voice.

On an indictment for breaking and entering a bank, after proof of a conspiracy between the defendant and others, in pursuance of which the bank was entered and

robbed, evidence that a director of that bank was taken by one of the conspirators, other than the defendant, to see another conspirator, with whom he had negotiations relative to the return of the stolen property, is admissible.

At the trial of an indictment for breaking and entering, a witness may testify that, a few days before, he sold to a man certain articles of clothing like those left by the offender near the scene of the crime, there being other evidence tending to show that that man was the defendant.

At the trial of an indictment for breaking and entering a bank with intent to commit larceny therein, evidence of an accomplice of a general conspiracy previously formed between the defendant, himself and others to rob banks, in pursuance of which the robbery of the bank in question was planned and carried out, as well as of the acts of the conspirators in making preparations for carrying out the robbery, is admissible.

Evidence admissible to prove a crime charged is not made inadmissible because it tends to prove other crimes.

After proof of a conspiracy between the defendant and others to rob banks, and that, after a robbery, one of the conspirators met the others at a certain place, evidence that the conspirators had previously arranged for calling such meetings and for warning each other of danger by means of "personals" in a certain paper, the "personals" so inserted by them, and the paper containing them, are admissible; and whether the defendant did or did not see one of the "personals" inserted to warn him of danger is immaterial.

The admission, subject to the defendant's objection, of evidence which the jury are afterwards instructed to disregard, affords the defendant no ground of exception, if the evidence is competent.

Where, in a criminal case, the testimony of an accomplice is corroborated by other evidence, the judge is not required to advise the jury to acquit; and an instruction advising them of the suspicious character of his testimony, and that it was not safe to convict unless it was corroborated in some portion material to the issue, affords the defendant no ground of exception.

INDICTMENT against Robert Scott and James Dunlap, for breaking and entering, on January 26, 1876, the banking house of the Northampton National Bank, at Northampton, with intent to commit larceny therein. Trial in the Superior Court, before *Bacon,* J., who allowed a bill of exceptions in substance as follows:

1. At the opening of the trial, the district attorney moved that Edward B. Gillett, esquire, be allowed to assist the government in the prosecution of the case. Objection being made by the defendants, Mr. Gillett stated to the court that, as he understood it, he was present simply by procurement of the district attorney, without any assurance or expectation of compensation from any private source, and that he would be as free to act impartially in the matter as he should be and as he was when he was acting in the judicial office as district attorney. In answer

to interrogatories put by the defendants, it appeared that he was first applied to, to act in the trial, by letter from the private counsel of the bank, and that he afterwards received a letter from the district attorney requesting his assistance. The counsel for the defendants said, inquiringly, "You don't suppose that you stand in such circumstances that you could possibly receive, for the labor you may spend here, any present from the bank?" to which Mr. Gillett (facetiously) replied: "Well, sir, I should not care to have my virtue put to any very strong test, your honor, upon a subject of that sort, of course." To the further question, "Whether he would not consider it an extremely mean bank if it did not pay him?" he said, "I have not formed any opinion upon that subject."

The judge thereupon said that, unless there was something further, he would allow Mr. Gillett to act as desired by the district attorney; it being understood that the district attorney retained the responsible management of the case.

2. It appeared in evidence that, on the night of January 26-27, 1876, the Northampton National Bank was broken into, and that a large number of valuable securities were stolen from it. It also appeared in evidence that, on the same night, the house of John Whittelsey, the cashier of the bank, was entered by five masked burglars, with dark lanterns, when the different inmates of the house were taken from their several rooms and led into the room occupied by Whittelsey; that, after remaining there a short time, Whittelsey was ordered to dress, and was taken out of the room into the upper hall and there guarded for some time, and then taken down stairs, when the combination of the lock on the vault of the bank was extorted from him by two men whom he claimed to identify as the defendants. Upon his direct examination, Whittelsey stated that he identified them from their general appearance, height, size and form, and especially from their voices; that their voices impressed him more than anything else; that he suspected they might be arrested some time, and he watched them closely; that he noticed particularly Scott's broad shoulders. On cross-examination, the witness stated that there was nothing peculiar about the height, size and form of the defendants differing from other men in the community, excepting that the defendant Scott had a peculiar

shrug about the shoulders; that he had noticed this shrug several times at the jail since Scott's arrest, but that he would not undertake to pronounce him guilty from this shrug alone; that he would undertake to identify them by the voice; and, to the question whether there was any peculiarity about the voice, he said he could not answer. The defendant Scott was then asked to stand up and repeat something, which he did, and the witness said he was suppressing his voice. Scott was then told by his counsel "to speak it right out." The judge then said, "I do not think this is competent." The counsel for the defendants contended that he had a right to have the peculiarities of the defendants' voices pointed out by the witness, and that for this purpose the voices themselves were competent to be introduced. The judge ruled otherwise.

3. The government contended, and, against the objection of the defendants, was allowed to show, by one William D. Edson, a witness for the government, that, in the year 1873, Edson, the two defendants and one William Connor formed a general conspiracy to rob banks; that it was a part of their plan and understanding that, in their travels through the country, they should obtain information of such banks as were insecure and feasible for robbery, and should report to each other the results of their observation; that in the summer of 1875, Edson, who was in the employ of Herring & Company, of New York, safe makers, and had been sent by them to Northampton on business of the company, first informed himself of the practicability of robbing the Northampton National Bank, and reported the same to the defendants at Wilkesbarre, Pennsylvania, and then furnished the defendants the means of duplicating the keys of the vault lock; that this was done in pursuance of their general conspiracy before mentioned.

4. The witness Edson was allowed, against the objection of the defendants, to testify as to the details of preparations made or robbing the Northampton National Bank in pursuance of said conspiracy; and he testified, among other things, that after meeting the defendants at Wilkesbarre, and giving them information about the dial and lock of the Northampton National Bank, which was about August 5, 1875, he, with Scott and Dunlap, returned to New York together, and that Scott and Dunlap

there practised with the duplicate keys, which Scott had made, on a sample dial which Edson furnished them; that Scott and Dunlap agreed to go to Northampton in a day or two, which they did; that they told him, Edson, they had found where Whittelsey the cashier lived, in what part of the house, and how many there were in the family, &c.; that afterwards there was another meeting, when Connor was also present, and Scott, Dunlap and Connor all agreed to go to Northampton; that they afterwards said they had been there; that they had watched Whittelsey's movements, and those of the watchmen of the bank and of the town; that the witness, at their request, went to Northampton and saw the president and vice-president of the bank, and found that the dials were out of order, and went back to New York and told the defendants and Connor that they had better stop work then, as the bank would be more carefully guarded than usual; that this was in September, and the work was abandoned, and nothing further was done till November; that afterwards, Scott, Dunlap and Connor wanted the witness to come to Northampton and see about the Northampton National Bank; that the witness did so on November 22, and obtained impressions of the key at the bank, and, on his return to New York, gave the defendants the impressions; that he also afterwards found out the combination and gave it to the defendants; that he had five or six interviews with the defendants before the robbery in January. The defendants contended that the attempt to rob the Northampton National Bank in the summer of 1875 was abandoned, and that the evidence of that attempt was inadmissible. The government contended that the attempt was only temporarily suspended, and was resumed again in November. The judge admitted the evidence.

5. The government offered to show, by the witness Edson, that there were words and expressions, well understood by the defendants and Connor and Edson, by which they communicated with the witness Edson and with each other in the prosecution of their work under their conspiracy, through the column of the New York Herald, entitled "personals," and the witness Edson, against the objection of the defendants, was allowed to testify that on January 30, 1876, two "personals" appeared in the New York Herald which the witness claimed and stated were placed

there, one by himself, which he explained was for the purpose of having William Connor meet him; and the other placed there by William Connor, which he, Edson, explained as calling for a meeting between himself and Connor on business connected with the robbery. A copy of the New York Herald of January 30, 1876, was produced, and the "personals" identified and read by Edson, as follows: (Edson's "personal") "Idalia, F. N., meet me on the Avenue Monday evening." (Connor's "personal") "Idalia, F. N., 8 sharp." Edson further testified that the defendants, Connor and himself had agreed upon this form of personal, if they wished to see him; and that he met Connor at the corner of 34th Street and Broadway at 8 o'clock Monday evening; that Connor took him to 60th Street and 10th Avenue, where he met Scott, and afterwards Dunlap; and that Connor at this time handed him over about $1200, as his portion of the money taken from the safe.

6. The government contended, and offered evidence tending to show, that on February 5, 1876, the defendant Scott went by boat from New York to New Haven, with two horses and a sleigh, intending to go thence to Hartford, Springfield and Northampton, for the purpose of obtaining and bringing to New York the securities of which the bank had been robbed, and which had been secreted near the place of robbery; that after Scott's departure, Connor and Edson met in New York, and Edson informed Connor of certain facts showing the danger of going to Northampton at that time, and convinced him that Scott ought to be recalled. The witness, Edson, against the objections of the defendants, was allowed to testify that on February 7, Edson, with the concurrence of Connor, inserted in the New York Herald a "personal" which read as follows: "Knox, come home," and he referred to a copy of the Herald containing this personal. The witness further testified that Connor told him that Scott formerly had a horse by the name of Knox and would recognize the personal. The government, in connection with this evidence, produced evidence tending to show that Scott returned to New York without the securities and without having visited Northampton. But Edson testified that Scott said that he returned on account of a paragraph in the Springfield papers and that he did not see the personal in the Herald.

The defendants objected to the evidence of this personal, but the judge ruled that Connor was upon the evidence sufficiently connected with the conspiracy and with the robbery of the Northampton Bank to make his acts in furtherance of the common purpose of the conspirators admissible, and admitted the evidence, subject to the final consideration of the jury. The witness Edson further testified, against the defendants' objection, that, on the occasion when he told Connor that it was not safe for Scott to go to Northampton for the securities, Connor told him that he and Dunlap would go to Springfield and intercept Scott, and have him come home, and that other conversation passed between Connor and Edson at this time, having reference to the recalling of Scott. The admissibility of this evidence was discussed to the judge, as also its effect and bearing if admitted, and the government asked to have certain portions of it admitted, while it would not insist on other portions ; but the judge ruled that all these declarations of Connor should go in, subject to the defendants' exception, or all should be excluded, and the government then elected to withdraw all these declarations, and the judge ruled that none of the statements of Connor or conversations between Connor and Edson in the absence of the defendants, should be considered by the jury as in evidence, and he should instruct the jury to disregard them ; and in his charge the judge cautioned the jury not to consider any declarations of Connor or conversations between Connor and Edson, in the absence of the defendants. The defendants excepted both to the admission and the withdrawal of the evidence referred to. In the closing argument to the jury, the attorney for the government referred to this evidence and to the "personal," "Knox, come home," but no objection or exception was taken to this at any time, and the judge expressly charged that any declarations of Connor or Edson made in the absence of the defendants were not to be considered by the jury.

7. The witness Edson was allowed, against the defendants' objection, to testify that, in November, 1876, he took L. B. Williams, one of the directors of the bank, to see Connor in relation to negotiating for the stolen property. The witness had previously been allowed, against the defendants' objection, to state in his account of the conspiracy, and of the robbery of the

Northampton Bank in pursuance thereof, that Connor's part in the conspiracy, and in the robbery of the bank in pursuance thereof, was to receive the money and distribute it, and negotiate the securities. The government, in connection with the foregoing evidence of Edson, called Williams, who testified that he, at the time mentioned by Edson, had an interview with Connor in relation to negotiating the stolen securities.

8. One Hall, of Springfield, a member of the firm of Hall & Prew, a witness for the government, was allowed to testify, against the objection of the defendants, that two persons came to his store in Springfield one or two afternoons before the announcement of the burglary, and purchased a pair of drawers and socks which were like some found among the things left at the cashier's house on the morning after the robbery. The witness identified certain overalls, by peculiar marks, as being those he sold at his store; he also said that the drawers were the same kind in all respects as he sold, so far as he could judge; but the witness could not say that either of the defendants was the one who purchased these goods; that he thought he had seen Dunlap before, but could not tell when or where. The witness also stated that he did up the goods in a paper wrapper with the printed advertisement of " Hall & Prew " thereon. The judge said that unless this evidence was afterwards further connected with the defendants it should be excluded. The government offered, as the further evidence relied on, the evidence of one Holt, also of Springfield, who testified that on the two days previous to the robbery he saw the defendants at various places in Springfield, and watched their movements; that they went into stores or saloons there, though the witness did not testify to seeing them go into Hall & Prew's store. The government further offered evidence tending to show that one of the masks left behind at Whittelsey's house had been cut from and exactly fitted the remaining portion of a leg of one of the pairs of drawers sold by Hall, and that this remaining portion of a pair of drawers was found with a great variety of burglars' tools, on the day before the robbery, at a place claimed by the government to be a place of rendezvous and concealment resorted to by the burglars. The government also offered evidence tending to show that a paper wrapper on which was the printed advertise-

ment of "Hall & Prew," Springfield, was found among the burglars' clothing and tools left behind at Whittelsey's house and found on the morning after the robbery.

When the attorney for the government, in his closing argument, was commenting on the effect of this evidence of Hall, in connection with the other evidence recited, as tending to identify the defendants as the persons who bought the goods of Hall, the defendants made no suggestion or objection then, nor at any other time, that the evidence of Hall had not been properly connected with other evidence to make it admissible.

9. L. B. Williams, one of the directors of the bank, was called by the government and asked if he had a meeting with Connor on the occasion testified to by Edson, and he was allowed to answer that he had. He was then asked under whose direction, if any, he had this meeting; this was objected to, and the witness was allowed to answer that he had it by arrangement with Edson who took him to see Connor.

10. The witness Edson testified that he was to report to the defendants at Wilkesbarre, Pennsylvania, as to the Northampton National Bank, and that he did so. The time, place and circumstances of the interview between Edson and the defendants at Wilkesbarre, were claimed to be material evidence for the government; and, among other things, it was testified by Edson that it had been arranged between Dunlap and Edson that Edson should address Dunlap under the fictitious name of R. C. Hill, at the " Wyoming Valley House," Wilkesbarre. The register of this hotel was introduced, against the defendants' objection, and Edson was allowed to point out his own signature on the register, under date of August 5th, and also the alleged signature of Dunlap, under the assumed name of R. C. Hill, as on the register at the time Edson arrived, and, on the register, the room purporting to be assigned to R. C. Hill was No. 27, which room Edson visited and found Dunlap occupying, and that they there conferred together in regard to the Northampton Bank robbery. The defendants excepted to the admission in evidence of Edson's signature on the hotel register.

11. It was contended by the government that the witness Edson was corroborated on material points by the evidence of other independent witnesses, as well as by much circumstantial evi-

dence, the tendency and effect of which was, as the government contended, to show that the acts and admissions of the defendants in relation to the robbery had been truthfully narrated by Edson, while the defendants contended that much of it only corroborated the mere acts and declarations of the witness Edson, and had no tendency to connect the defendants with the robbery. The judge gave instructions as to the kind of corroboration required. The defendants asked the judge to instruct the jury as follows : " That the corroboration required of the witness Edson is not the corroboration of that part of the witness's story which relates to his own acts and declarations, but corroboration of that part of his story which connects the defendants with the robbery." The judge declined to give the instruction in the terms requested, but did instruct them as follows : " That Edson, being a confessed accomplice, it was not safe for a jury to convict the defendants on his uncorroborated testimony, although, if they believed his testimony, they could do so. The testimony of an accomplice should be scrutinized with extreme caution by the jury, and it is not safe or prudent for the jury to convict in this case upon the evidence of Edson alone, unless he is corroborated in important and material respects in matters vital to the issue in this case." The judge had previously stated, in charging the jury, what matters and things it was incumbent on the government to prove, in order to ask of the jury a verdict of guilty, in terms to which no exception was taken.

The jury returned a verdict of guilty against both defendants ; and the defendants alleged exceptions.

*H. H. Bond,* for the defendants.    1. Mr. Gillett should not have been allowed to act as prosecuting attorney. , It is not contended that in certain instances other counsel may not assist the district attorney.    But this right has been carefully guarded in each instance, and the general rule is, that under ordinary circumstances it is not to be permitted.    *Commonwealth* v. *Williams*, 2 Cush. 582, 585.    And, if improperly allowed, it is ground of exception.    *Commonwealth* v. *Gibbs*, 4 Gray, 146. The office is essentially a judicial one, and, like all such offices, is carefully guarded from private influence and gift.    In this case the first application came from private counsel of the bank, and Mr. Gillett plainly intimated that he was open to a gift

from the bank. This was not the free, independent position which is required.

2. The peculiarities of the defendant Scott's voice were material to the issue, and the defendants were entitled to have these peculiarities pointed out on cross-examination. And for this purpose the voice of the defendant could be introduced, on the same principle that a party, on cross-examination, may write his name for the purpose of comparison. *Chandler* v. *LeBarron*, 45 Maine, 534. See also *King* v. *Donahue*, 110 Mass. 155. Suppose it were a peculiar garment that the prisoner had on, or there were some peculiarity in his shape, or some peculiar mark about his person, would it not be competent to ask the witness to point it out, introducing the garment or person for the purpose? And, if so, why not the voice? It is in the same way a material fact to be examined, compared and weighed in connection with the witnesses' testimony.

3. Evidence of the general conspiracy in 1873 was inadmissible. It is within the rule that different and distinct offences cannot be shown in evidence against the accused. That these parties conspired to rob banks in 1873 can have no legal tendency to show that they robbed the Northampton Bank.

4. An attempt which the witness said had been abandoned, and which was remote in point of time, cannot be introduced as evidence of a later robbery. Suppose they had actually broken in and stolen, could it be introduced in evidence? and why any more an attempt? See *Rex* v. *Birdseye*, 4 Car. & P. 386; *Regina* v. *Butler*, 2 Car. & K. 221.

5. The government had no right to put in the "personal" inserted by the witness Edson in the Herald; because he had no arrangement to that end with the defendants; and there was no evidence that they saw it. It related to Connor only; and was corroborating the witness by his own act.

6. The conversation with Connor, being after the alleged offence, was inadmissible. 1 Greenl. Ev. § 111. 1 Phil. Ev. (4th Am. ed.) 209. The defendants were injured by the judge allowing the government to put in the evidence, then to withdraw it, and then to urge it to the jury as a ground for conviction. See *Root* v. *Lowndes*, 6 Hill, 518.

7. The evidence that Edson, nearly a year after the robbery, took one of the directors of the bank to see a person in relation to negotiating for the property, and the testimony of that director that he went at the instance of Edson, were immaterial. They were put in for the purpose of corroborating Edson in a collateral matter, and tended to prejudice the jury.

8. Whether or not the witness Hall sold the drawers, overalls and socks found at Northampton was immaterial, except as he could identify the defendants as the persons buying them. This he said he could not do. And he ought not to have been allowed to state that he had seen Dunlap somewhere before his arrest.

9. The same objection exists to the evidence admitted under this exception as to that under the 7th exception.

10. The admission of the signature of Edson on the hotel register was objectionable, because it merely corroborated his evidence of his own act.

11. The instruction asked for, in regard to the corroboration of the accomplice Edson, should have been given. *Rex* v. *Addis,* 6 Car. & P. 388. *Rex* v. *Webb,* 6 Car. & P. 595. *Rex* v. *Wilkes,* 7 Car. & P. 272. *Regina* v. *Farler,* 8 Car. & P. 106. *Regina* v. *Dyke,* 8 Car. & P. 261. *Commonwealth* v. *Bosworth,* 22 Pick. 397, 399. *Commonwealth* v. *O'Brien,* 12 Allen, 183, 184. *Commonwealth* v. *Larrabee,* 99 Mass. 413, 415. *Commonwealth* v. *Elliot,* 110 Mass. 104. *Commonwealth* v. *Snow,* 111 Mass. 411, 414. *State* v. *Wolcott,* 21 Conn. 272, 282. *Wright* v. *State,* 43 Texas, 170. *People* v. *Cloonan,* 50 Cal. 449. Rosc. Crim. Ev. 131. 1 Phil. Ev. (4th Am. ed.) 117. 1 Whart. Am. Crim. Law, § 789.

The instructions given did not meet the law applicable to the case, or give to the jury a clear idea of what was required in the way of corroboration. *State* v. *Williamson,* 42 Conn. 261. *Commonwealth* v. *Brooks,* 9 Gray, 299, 301.

*C. R. Train,* Attorney General, & *W. C. Loring,* Assistant Attorney General, for the Commonwealth.

MORTON, J. The questions raised in this case are numerous, and it will be convenient to consider them in the order in which they are stated in the bill of exceptions.

1. It is well settled in this Commonwealth that while, as a general rule, the district attorney or other prosecuting officer

should conduct the trial of criminal cases, yet it is within the power of the court in particular cases, in which from peculiar circumstances the interests of public justice seem to require it, to appoint a counsellor of the court to assist the public officer in the trial. The rule and its limitations are stated in *Commonwealth* v. *Williams*, 2 Cush. 582. See also *Commonwealth* v. *Knapp*, 10 Pick. 477; *Commonwealth* v. *Gibbs*, 4 Gray, 146; *Commonwealth* v. *King*, 8 Gray, 501. The questions, whether in a particular case the circumstances are such as to justify such appointment, and whether the person, whom the district attorney requests the court to appoint, is a fit and proper person, are necessarily to be decided, in the first instance, by the presiding justice, and the decision of them is, to a large degree, within his sound discretion.

The case at bar was one of great complication and difficulty, and nothing appears in the bill of exceptions which shows any error in the decision of the presiding justice to appoint a suitable person to assist the district attorney; and the evidence was sufficient to justify him in finding that Mr. Gillett was acting without any assurance or expectation of compensation from any private person and was a suitable person to appoint. The appointment was made at the request of the district attorney, who retained the responsible management of the case, and we are of opinion that the defendants' exception thereto cannot be sustained.

2. The court properly ruled that it was not competent for the defendant Scott to prove what was his usual and natural voice, by using his voice in the court-room "to repeat something," when not under oath as a witness. His manner of speaking being in question, there was no way of determining whether he would use his voice in the court-room in his natural or in a constrained and simulated manner, the genuineness of the voice used not being supported by his oath. *King* v. *Donahue*, 110 Mass. 155.

3. It was clearly competent for the government to show the whole history of the robbery with which the defendants were charged, from the inception of the scheme by them to its final consummation. The evidence excepted to tends to show the beginning of the plot or scheme of this robbery in the summer

of 1875. The fact of the general conspiracy, formed in 1873, was so connected with this scheme as to make it competent. It tended to explain and make intelligible the testimony of Edson as to the beginning of this scheme, as it accounts for the fact of his reporting to the defendants at Wilkesbarre, and furnishing them with the means of duplicating the keys of the vault lock.

The defendants' chief objection to this evidence is, that its admission violates the established rule that evidence which merely tends to prove that the defendants have committed other similar offences is inadmissible. But the evidence was competent as tending to prove the crime charged, and it is not rendered incompetent because it also tends to prove the commission of other crimes. *Commonwealth* v. *Choate*, 105 Mass. 451.

4. For the same reasons the testimony of Edson, as to the acts of the defendants and their co-conspirators in making preparations for carrying out the robbery, was competent.

The evidence tended to show, and the jury were justified in finding, that the plot or scheme of this robbery was formed in the summer of 1875, and that, though its execution was suspended during the months of October and November, it was never abandoned but resumed and conducted to a successful issue in the January following. All the acts of the defendants and their co-conspirators in the execution of the plot were therefore admissible.

5. There being evidence sufficient to be laid before the jury to prove the conspiracy, as to which the presiding justice was in the first instance to determine, it was competent for the government to put in evidence any acts of the several conspirators in furtherance of the common purpose of the conspiracy, either before or after the robbery was committed. *Commonwealth* v. *Brown*, 14 Gray, 419. Accordingly, Edson testified, without objection, that a few days after the robbery he met the defendants and Connor, who with Edson were the conspirators, in New York, on business connected with the robbery, and that the others then paid Edson $1,200 as his portion of the money stolen from the bank. But Edson was allowed to testify, against the defendants' objection, that the conspirators had previously arranged for calling such meetings by means of advertisements in the New York Herald, called "personals," and that this meet-

ing was called by a "personal" inserted by him as follows "Idalia, F. N., meet me on the avenue Monday evening," and that Connor replied by a "personal" as follows: "Idalia, F. N., 8 sharp." To the testimony of Edson as to the "personals" and to the introduction of the paper containing them, the defendants excepted. But the insertion of these "personals" were acts of two of the conspirators in carrying out the purposes of the conspiracy and were thus competent against the defendants. The newspaper was the best evidence of their insertion, and was important to fix the date of the meeting.

6. For the same reasons the "personal" "Knox, come home," inserted in the New York Herald to warn Scott of danger in his visit to Northampton for the purpose of bringing to New York the securities stolen from the bank, was competent. It was an act of two of the conspirators, tending to show that the robbery had been committed in pursuance of the conspiracy, and it is immaterial whether Scott saw it or not. So, also, any declarations or admissions of Connor, having this tendency, were competent, he having been shown to be one of the conspirators. This being so, the defendants cannot complain of the order of the court that all such declarations of Connor which Edson had testified to should be considered as in the case subject to the defendants' exception, or that all should be withdrawn, or of the subsequent ruling and instruction that all such conversations should be disregarded by the jury. All the conversations being competent, the ruling was too favorable to the defendants, and they were not aggrieved thereby. It does not present the case, as argued by the defendants, where the presiding justice has admitted incompetent evidence, and afterwards directed it to be stricken out and disregarded; and we need not consider whether, if such had been the aspect of the case, justice would require that a new trial should be ordered.

7. For the reasons stated above, the fact that Williams, one of the directors of the bank, met Connor, and had negotiations with him relative to the return of the stolen property, was competent, and the fact that Edson took him to see Connor was admissible as a part of the transaction, and as tending to corroborate Edson's testimony that he and Connor were members of the conspiracy.

8. The testimony of Hall, that about two days before the rob-bery he sold to two men in Springfield a pair of drawers and some socks like those left by the robbers in the cashier's house, was competent. There was evidence in the case tending to show that these two men were the defendants. The testimony of Hall was thus sufficiently connected with the defendants to enti-tle it to go to the jury, who alone were the judges of its weight.

9. The ninth exception is the same as the seventh, and is governed by the same principles.

10. Edson testified, without objection, that in August preced-ing the robbery he met the defendant Dunlap at Wilkesbarre for the purpose of conferring together in regard to the robbery. The government introduced, against the defendants' objection, the register of the Wyoming Valley House of Wilkesbarre, and Edson testified to his own signature thereon, under date of August 5, 1875, and that of Dunlap, under the assumed name of R. C. Hill. If there is doubt of the admissibility of this evidence upon other grounds, it was competent for the purpose of fixing the time when the interview took place.

11. The only remaining exception is that taken to the in-structions of the court in regard to the corroboration of the wit-ness Edson, and to the refusal to give the instruction requested, on this subject.

The government contended, and the bill of exceptions, though it does not purport to give all the evidence, shows, that there was evidence corroborating the part of the narration of Edson, which connected the defendants with the robbery, as well as the other parts.

We are of opinion that the court was not required, as matter of law, to give the instruction requested, and that the instruc-tions given are not open to exception by the defendants.

It is well settled that a jury may convict upon the uncorrobo-rated testimony of an accomplice, if it satisfies them beyond reasonable doubt of the guilt of the defendant. But it is the usual practice for the judge to advise the jury to acquit where there is no evidence other than the uncorroborated testimony of an accomplice.

If it can be held that this rule of practice, because of its uni-formity, has acquired the force of a rule of law, still there is not

the same uniformity in the practice as to the kind of corroboration required. The office of corroborative evidence is, by confirming the testimony of the accomplice in regard to matters which are not within the general knowledge but likely to be known only to those engaged in the crime, to induce the belief that he is to be generally credited in his statements. Its weight is for the jury, and there is no established rule of law which requires the judge, in a case where there is corroborative evidence of this character upon matters material to the issue, to advise the jury to acquit unless there is also corroboration of the statements connecting the defendant with the crime.

In *Commonwealth* v. *Bosworth*, 22 Pick. 397, the court say, as to the kind of corroboration required : " It is perfectly clear that it need not extend to the whole testimony; but, it being shown that the accomplice has testified truly in some particulars, the jury may infer that he has in others. But what amounts to corroboration ? We think the rule is, that the corroborative evidence must relate to some portion of the testimony which is material to the issue." In that case the evidence, held to be competent as corroborative, confirmed the accomplice as to a fact which did not tend to connect the defendant with the crime. Since this decision it has been usual to instruct the jury in substantial compliance with the rule stated therein, though the practice of different judges in the exercise of their discretion has varied. *Commonwealth* v. *Brooks*, 9 Gray, 299. *Commonwealth* v. *Price*, 10 Gray, 472. *Commonwealth* v. *O'Brien*, 12 Allen, 183. *Commonwealth* v. *Larrabee*, 99 Mass. 413. *Commonwealth* v. *Elliot*, 110 Mass. 104. *Commonwealth* v. *Snow*, 111 Mass. 411. See also *Regina* v. *Stubbs*, Dearsly, 555 ; *S. C.* 7 Cox C. C. 48 ; *State* v. *Wolcott*, 21 Conn. 272.

In the case at bar, there being corroborative evidence, the presiding justice was not called upon to advise the jury to acquit, but was required to submit the case to them; and we are of opinion that the instruction given, which called the attention of the jury to the suspicious character of the testimony of the accomplice, and advised them, in substance, that it was not safe to convict unless his testimony was corroborated in some portion which was material to the issue, is not open to exception by the defendants.                    *Exceptions overruled.*