COMMONWEALTH *vs.* JAMES C. DONOVAN & others.

Middlesex.    November 22, 1897. — January 11, 1898.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Bribery — Indictment — Motion to Quash — Statute — Municipal Officer — City — Principal and Accessory — Promissory Note — Illegal Consideration — Law and Fact — Verdict.*

A motion to quash an indictment, on the grounds that it does not allege sufficient facts to constitute a crime, or set forth any offence known to the law or defined by the statutes, does not assign specifically the objections relied on, under Pub. Sts. c. 214, § 25.

If an indictment, under Pub. Sts. c. 205, § 9, as amended by St. 1891, c. 349, for bribery, in corruptly giving to a municipal officer a gift or gratuity to influence his vote on a certain question, alleges the doing of the prohibited act fully, directly, and expressly, and each count concludes with the averment that the acts charged were "contrary to the form of the statute in such case made and provided," an objection that it is defective in not setting forth that the gift or gratuity was given contrary to the statutes is untenable.

An indictment for bribery, which charges the defendant with corruptly giving to a municipal officer a gift or gratuity to influence his vote on the question of the removal of A. from the office of city treasurer and collector of taxes of a certain city, which might by law come and be brought before such officer in his official capacity as a common councilman, need not allege that A. had been elected or appointed to the office of city treasurer and collector of taxes, or that he in fact held that office.

By the charter of a city, its treasurer and collector of taxes was to be chosen annually as soon after the organization of the city council as might be convenient, and the meeting for organization was directed to be held on the first Monday of January. By a subsequent statute the power of filling the office was transferred to the mayor, who, on February 19 of a certain year, appointed A. to such office, the term of the then incumbent expiring on the first day of the next April. On February 20, a statute restoring the power of appointment to the city council took effect. At the trial of an indictment, under Pub. Sts. c. 205, § 9, as amended by St. 1891, c. 349, for bribery, in corruptly giving to a common councilman a gift or gratuity to influence his vote on the question of the removal of A., which might come before him in his official capacity, the evidence justified a finding that, when the gift to the councilman was made, A. not only intended to accept the office, but that he had so stated openly in the councilman's presence, and also that the question of his removal from the office by action of the city council was matter of common discussion with that of the removal of other officers similarly appointed. *Held,* that it appeared that the question of A.'s removal in fact might come before the councilman in his official capacity; and that it might come before him by law, within the meaning of the statute.

An appointment of a municipal officer, made at a proper time by the mayor of the city, who is then authorized by law to make it, does not become inoperative by a subsequent transfer of the power of appointment to the city council, by a statute

passed before the appointee has accepted the appointment, and before the term of office begins.

An indictment for bribing a municipal officer, alleging that ten promissory notes, each of the value of twenty-five dollars, were given to him, is not open to the objection that it is defective in not stating that anything of value was given to such officer, or in not stating by whom the promissory notes were made.

An indictment, charging A. with corruptly giving to a municipal officer a gift or gratuity to influence his vote on a question of removal from office, which may come before him in his official capacity, sets forth an offence to which B. can be an accessory.

It cannot be said, as matter of law, that a negotiable promissory note, payable at a future time, and delivered as a gift to the payee by one who is an original party to it as one of two promisors, is of no value, because the signature of the other promisor is a forgery and the only consideration is an illegal one.

The contention of one indicted as accessory to the crime of bribery committed by another, that there was not sufficient evidence to warrant the jury in convicting him and that a verdict of not guilty as to him should have been ordered, will not be sustained, if there are views of the evidence reported in the bill of exceptions in which the inference of his guilt is not unreasonable.

At the trial of an indictment for bribery, in corruptly giving to a municipal officer a gift or gratuity, consisting of promissory notes, to influence his vote on a certain question, it is not necessary for the government to show that such officer, in accepting the gift, made any promise as to his future action or vote; nor is it a defence that the defendant gave the notes, believing them to be worthless.

Upon an indictment in three counts, charging in the first count that the defendant corruptly gave to a municipal officer a gift or gratuity to influence his vote on a question of removal from office, which might come before him in his official capacity, in the second count that the purpose of the gift was to influence its recipient to vote "Nay" on the question, and in the third count that it was to influence him to refrain from voting, verdicts of guilty on the first count and of not guilty on the second and third counts are not inconsistent.

INDICTMENT, in three counts, under Pub. Sts. c. 205, § 9, as amended by St. 1891, c. 349, charging James C. Donovan with bribery, and Edward R. Donovan and Bernard D. O'Connell with being accessories thereto. At the trial in the Superior Court, before *Bond,* J., the jury returned a verdict of guilty against each defendant upon the first count, and of not guilty upon the other counts ; and the defendants alleged exceptions, and also appealed from the overruling of certain motions. The facts appear in the opinion.

*S. J. Elder & E. A. Whitman,* (*J. C. Burke* with them,) for the Donovans.

*B. D. O'Connell, pro se.*

*F. N. Wier,* District Attorney, for the Commonwealth.

BARKER, J. In this prosecution for bribery, under Pub. Sts. c. 205, § 9, as amended by St. 1891, c. 349, the three defendants

have had verdicts of not guilty upon the last two counts of the indictment, and there has been a verdict of guilty against each defendant upon the first count. That count charged James C. Donovan with corruptly giving to a municipal officer a gift or gratuity to influence his vote on a question of removal from office, which might come before him in his official capacity, and also charged that the other defendants were accessories to the crime. The second count charged that the purpose of the gift was to influence its recipient to vote " Nay " on the question of removal, and the third count that it was to influence him to refrain from voting. The verdict of not guilty upon the third count was by direction of the court at the suggestion of the District Attorney, but the verdicts upon the first and second counts were rendered in the usual way.

The record shows a motion to quash the indictment, filed by the defendant O'Connell, and another motion to quash filed by the two Donovans; a motion filed at the trial by each defendant to direct a verdict of not guilty; a motion by the defendant O'Connell to set aside the verdict; and motions by each defendant for new trial and in arrest of judgment. There are also two bills of exceptions, the first relating to the overruling of the motions to quash and to the proceedings at the jury trial, including the denial of the motions to order verdicts of not guilty, and the second to the overruling of the motions in arrest of judgment. The record also shows appeals from the overruling of O'Connell's motion to set aside the verdict, and of the several motions for new trial and in arrest of judgment.

The first bill of exceptions does not purport to state all the evidence which was before the jury, but the second bill states that all the evidence and facts material to the second bill are contained in the first bill.

The crime of which the defendants were convicted was connected with questions arising under the charter of the city of Lowell and the amendments thereto, some phases of which have been already considered by this court. By St. 1896, c. 415, all the executive powers vested in the city council were conferred upon the mayor, who proceeded to make appointments to offices, which, except for this change in the charter, would have been filled by action of the city council. The mayor's right to appoint

was contested, but was finally affirmed in *Attorney General* v. *Varnum*, 167 Mass. 477. While that case was pending, a bill restoring the power of appointment to the city council had passed both branches of the Legislature, and was under consideration by his Excellency the Governor on February 19, 1897, when the rescript affirming the mayor's power was sent down in *Attorney General* v. *Varnum*. On the evening of that day the mayor made a number of appointments to office, one of which was an appointment of the defendant Edward R. Donovan to the office of city treasurer and collector of taxes, which office was to become vacant on the first day of the next April, by the expiration of the term of the then incumbent. On February 20, 1897, the bill restoring the power of appointment to the city council became a law, as St. 1897, c. 95. The mayor was a Democrat and two thirds of the city council were Republicans, and the question of the removal by the city council of the mayor's appointees of February 19 was at once raised, the city council having a power of removal by two thirds vote in each branch, under St. 1896, c. 415, § 2. This court, without considering whether the mayor's appointments of February 19 were valid or not, subsequently held, in *Attorney General* v. *Cahill*, 169 Mass. 18, that removals by the city council of persons so appointed to office by the mayor on February 19, under the section cited, were effectual, and that after such removals the city council was authorized to fill such offices under the power restored to it by St. 1897, c. 95. When that statute went into effect, on February 20, 1897, one Lang was a Republican common councilman and so a member of the city council, and the offence charged was the corruptly giving to him of a gift of ten promissory notes to influence his vote in his official capacity as such common councilman upon the question whether Edward R. Donovan should be removed from the office of city treasurer and collector of taxes.

The acts of the defendants which the government relied upon to obtain their conviction were done on February 26, 1897. This was on Friday, and on the evening of the following Monday, March 1, a caucus of the Republican members of the city government was to be held to determine whether the Republican members of the city council should unite to remove, under

St. 1896, c. 415, § 2, the mayor's appointees of February 19, and
the question of such removal was a matter of public discussion.
On the morning of Friday, February 26, O'Connell and James
C. Donovan drove to Lang's house, and O'Connell had a conver-
sation with Lang in which O'Connell asserted Edward R. Dono-
van's fitness for the position to which he had been appointed, and
urged Lang to use his influence to secure his retention, saying
that it was unfair to attempt to change officials appointed under
the charter accepted by the citizens. O'Connell made no offer
or suggestion of a bribe, but the evidence tended to show that
at the close of the conversation Lang said, " Well, as the old
saying is, what is there in it for me?" and that O'Connell re-
plied, "That's all right, — have you any objections to see Mr.
Donovan?" and upon Lang's answer in the negative, O'Connell
said that Donovan and himself would come to Lang's place and
see him. On the other hand, O'Connell testified that, in answer
to Lang's question, "What is there in it for me?" he replied
that he knew nothing about that, and he gave an account of the
remainder of the talk, from which it would appear that the ap-
pointment for O'Connell and Edward R. Donovan to meet Lang
was for the purpose of showing Lang by a personal interview
that Edward R. Donovan was fit for the office. This appoint-
ment was for ten o'clock in the forenoon, and before that hour
Lang consulted with the chairman of the Republican city com-
mittee. In pursuance of the appointment, O'Connell and Ed-
ward R. Donovan called upon Lang, a witness of the conversation
being concealed behind a partition. The evidence tended to
show that at this interview the arguments of the morning were
repeated, and that Edward R. Donovan said that he would like
to retain his position and be kept in office, and that towards the
close of the interview, no suggestion of buying or bribing Lang
having been made by either O'Connell or Donovan, Lang said,
" It will take a good deal of money to buy me." Lang testified
that Donovan replied, " Yes, that will be all right; my brother
will come and see you"; and that O'Connell said, " Have you
any objections to that?" to which Lang replied, " No, sir, the
brother can come and see me"; and that an arrangement was
made that James C. Donovan, the brother, should meet Lang
at his store at three o'clock. Lang also testified that Donovan

and O'Connell agreed that they had better not go out of Lang's store together, and that they left separately. On the other hand, Edward R. Donovan and O'Connell testified that Lang said, "This is worth something to you fellows, is n't it? well, what is there in it for me?" and that O'Connell replied, "I am a poor man and cannot offer you anything," and Edward R. Donovan said, "I am in no position to make you any offer," and they denied that any arrangement was made for the brother to call, or by which they left separately. They further testified that Lang told them to see him later, that he would be there the greater part of the afternoon, and that they told Lang distinctly that what they wanted was his assistance at the caucus to be held the following Monday night. Lang testified that something might have been said about a caucus, but he did not recollect it, and also that Edward R. Donovan said that he would like to retain his position and be kept in office, specifying the office of city treasurer as the one to which he was referring; also that Lang said, "I don't understand the law points, but the point you want to get at, Mr. O'Connell, you want me to vote for Mr. Donovan, is it not?" and that he answered, "Yes, Mr. Donovan, the appointee of the mayor."

About three o'clock on the same afternoon, James C. Donovan appeared at Lang's store, where, through the suggestion of the chairman of the Republican city committee, three persons, one of whom was a stenographer, were concealed, who testified that Donovan said that he would like to have his brother Ned kept in office, and that Lang replied that he was a Republican, and it would be fatal to him if he should break from the party; that Donovan said it would blow over; that Lang said it would take a good deal of money to buy him, and Donovan said, "Well, how much?" that after considerable talk Lang said it would cost five hundred dollars, which Donovan refused, and Lang agreed to take two hundred and fifty dollars; Donovan wanted to know how he would take it, and Lang wanted cash, but after more talking agreed to take ten notes of twenty-five dollars each, which Donovan agreed to give him; that Donovan went out, and after three quarters of an hour returned with ten notes, which he gave Lang, telling him that they were signed by Edward R. Donovan and indorsed by himself. The notes were for twenty-

five dollars each, purporting to be signed by Edward R. Donovan and indorsed by James C. Donovan, payable to the order of Lang, all dated February 26, 1897, one payable three days after date, and the others from one to nine months after date.

It appeared from the testimony of Edward R. Donovan, and was not controverted, that the signatures of E. R. Donovan upon the notes were not genuine. James C. Donovan did not testify, but Edward R. Donovan testified that he did not sign the notes, and both he and O'Connell testified that they had no knowledge that the notes were to be given or had been given until the next day, and that they had no communication with James C. Donovan from the time that they left Lang's store in the forenoon until after James C. Donovan left Lang's store in the afternoon, and in this they were corroborated by other witnesses. O'Connell also testified that the next morning he went to see another councilman in behalf of Edward R. Donovan, and that he also tried to communicate by telephone with another councilman.

Lang also testified that he refused to sign an agreement presented to him by James C. Donovan that he would keep E. R. Donovan in office as city treasurer, and that he did not agree in terms to take any action or refrain from any action on accepting the notes.

Edward R. Donovan never accepted the office to which he had been appointed, never qualified therefor, and never assumed to act therein. The question of his removal never came before either branch of the city council; but a vote was passed by the city council on March 9, 1897, that the mayor's other appointees of February 19, each of whom had signified his acceptance of the office to which he was appointed, be removed.

O'Connell, who was then an attorney at law, testified that James C. Donovan went to his office and requested him, as a neighbor and friend, to use his influence with such aldermen and councilmen as he knew to argue and vote in the caucus against turning out the mayor's appointees; and that he saw Alderman Derby and Councilman Scott. He also said, upon cross-examination, that he knew that the negative vote of a single Republican councilman upon the question of the removal of the mayor's appointees would prevent the removal, and that it was a matter of common talk in the city.

We proceed to the consideration of the questions raised by the appeals and the bills of exceptions, treating together such questions, however raised, as properly can be so considered.

1. The third allegation in O'Connell's motion to quash, that the indictment does not allege sufficient facts to constitute a crime, and the first allegation in the motion of the other defendants, that the indictment does not set forth any offence known to the law or defined by the statutes, are insufficient to require us to consider formal defects apparent upon the face of the indictment, because they do not specifically set forth the objections relied upon, if any such there were. Pub. Sts. c. 214, § 25. *Commonwealth* v. *Murray*, 135 Mass. 530. *Commonwealth* v. *Schaffner*, 146 Mass. 512. *Commonwealth* v. *Lane*, 157 Mass. 462. *Commonwealth* v. *Dunleay*, 157 Mass. 386. *Commonwealth* v. *Langley*, 169 Mass. 89.

2. The second allegation of the motion of the Donovans to quash the indictment avers that it is defective in not setting forth that the gift or gratuity was given contrary to the statutes. The statute as amended prohibits corruptly giving any gift or gratuity whatever to any municipal officer with a certain intent. The doing of the prohibited act is fully, directly, and expressly alleged by the indictment, and each count concludes with the averment that the acts charged were " contrary to the form of the statute in such case made and provided." No further, if any, reference to the statute was necessary. *Commonwealth* v. *Hoye*, 11 Gray, 462. Pub. Sts. c. 213, § 16.

3. The first and second averments of O'Connell's motion to quash, and the fifth and sixth of the Donovans' motion, are upon the ground that the indictment does not allege that Edward R. Donovan was in fact or in law city treasurer and collector of taxes, and that it does not appear by the indictment that he could be affected by any vote of the city council. At the trial the defendants also urged, in support of their motions to direct a verdict of not guilty, that it did not appear that the question of his removal was one which by law could come before Lang as a member of the common council, and that Donovan's appointment on February 19, to take effect on April 1, was annulled by the passage of St. 1897, c. 95. One of the requests for rulings was also to the effect that, if Donovan had not

accepted the office and qualified therefor when the notes were given to Lang, the verdict should be not guilty. So far as the motions to quash are concerned, it is enough to say that the indictment expressly and fully alleges that the question of Donovan's removal from the office of city treasurer and collector of taxes might by law come and be brought before Lang in his official capacity as common councilman. As matter of pleading an allegation that Donovan had been elected or appointed to that office, or that he in fact held the office, was no more necessary to a charge of the offence prohibited by the statute, than an allegation that there was such an office, or that Lowell was a city having a charter under which such an office existed. The gist of the offence is the corruptly giving to a municipal officer of a gift or gratuity, with intent to influence his vote upon a matter which may by law come before him in his official capacity, and all this is distinctly alleged.

With respect to the question of proof, we are of opinion that the evidence justified a finding that the question of Donovan's removal from the office was one which by law might come before Lang in his official capacity as a member of the city council. The city treasurer and collector of taxes, by the provisions of the charter, was to be chosen annually. St. 1875, c. 173, § 17. It appears that the term of the incumbent who was in the office on February 19, 1897, was to expire on the first day of the next April. Before entering upon the duties, the person who is to fill the office is required to qualify, and give bonds which must be approved by the mayor and aldermen. Pub. Sts. c. 27, §§ 79, 105; c. 28, § 2. This implies that the election or appointment shall be made a convenient time before the person chosen to the office is to assume its duties. Besides this, the section of the charter above cited, which empowered the city council to elect the city treasurer and collector of taxes annually in convention by joint ballot, directed that it should be done as soon after their organization as might be convenient, and the meetings for organization are directed to be held on the first Monday of January, on which day the municipal year begins. St. 1875, c. 173, §§ 3, 11. By a sufficiently plain implication, the mayor, who assumes his office on the same day, when the power of filling the office was transferred to him by

St. 1896, c. 415, § 1, might exercise that power as soon as it might have been exercised by the city council, if the transfer had not been made. It was therefore within the power given by law to the mayor to appoint a person to be city treasurer and collector of taxes when, on February 19, 1897, he appointed Donovan to that office, and the making of the appointment on that day did not rest solely upon convenience or expediency. The evidence justified a finding that, when the gift to Lang was made, Donovan not only intended to accept the office, but that he had so stated openly in Lang's presence, and also that the question of his removal from the office by action of the city council was matter of common discussion with that of the removal of other officers similarly appointed. It was therefore apparent that in fact the question of his removal might come before Lang in his official capacity, and we are of opinion that it might come before him by law within the meaning of the statute. The appointment having been made at a proper time, by an officer then duly authorized to make it, we see no valid reason why it should become inoperative by a subsequent transfer to another department of the right to elect or appoint to that office. The statute so transferring the power, St. 1897, c. 95, speaks in the future tense, and cannot fairly be construed to annul appointments already lawfully and properly made, or to vest in the city council a power of appointment which, when that statute went into effect, the mayor himself did not have. On February 20, 1897, when the statute transferring the power took effect, the mayor could not make an appointment to the office, because he had already exercised his power, and had made an appointment which the appointee could accept, and by accepting perfect his title to the office. Until something occurred to show that the appointee of the mayor would not accept the office, or could not enter upon it, neither the mayor nor the city council, who succeeded to the power of filling the office, could make a new appointment. The right of his appointee to accept the office under the appointment lawfully made intervened to prevent another appointment, either by the mayor or by the city council, which, by force of St. 1897, c. 95, merely succeeded to such power as the mayor had. *State* v. *Love,* 10 Vroom, 14. *State* v. *Van Buskirk,* 11 Vroom, 463. This distin-

guishes the case from those where the making of an appointment before there is a vacancy in the office rests merely upon convenience, so that the appointment may be held to fall if the appointing power is changed before the appointee is entitled to assume his office, and from the cases in which a prospective appointment is made by an officer or board whose authority will be terminated before the vacancy occurs. See also *State* v. *Meehan*, 16 Vroom, 189 ; *State* v. *Lane*, 24 Vroom, 275 ; *State* v. *McCollister*, 11 Ohio, 46.

Upon a narrower view of the effect of the mayor's appointment, and without going so far as we have gone in holding the appointment valid, as the St. 1897, c. 95, speaks only in the future, not attempting to revise the construction placed upon St. 1896, c. 415, § 1, but merely to retransfer to the city council the power of election or appointment of city officers, Donovan, under the mayor's appointment of February 19, had at least a color of right to the office, which, under the decision in *Attorney General* v. *Cahill, ubi supra*, a vote of removal by the city council would be effectual to annul. Such a vote would have a substantial effect upon Donovan's relation to the office, and in this view, even if the appointment did not give him a clear right to the office, the question whether such a vote should be adopted was one which, within the meaning of the statutes, by law might come before Lang in his official capacity as a member of the council, and the decision of which might affect Donovan's relation to the office, whether the appointment was valid or not.

4. The remaining averment of O'Connell's motion to quash relates only to the third count, upon which there was a verdict of not guilty, and the question raised by it has not been argued, and for these reasons need not be considered.

5. The third averment of the Donovans' motion to quash, that the indictment is defective in that it does not state that anything of value was given to Lang, is as a matter of pleading plainly untrue, as the indictment alleges that ten promissory notes each of the value of twenty-five dollars were given to him.

6. The objection taken by the fourth averment of the same motion, that the indictment is defective in not stating by whom the promissory notes charged to have been given to Lang were made, is unsound. The indictment charges the gift of promis-

sory notes. Such notes in law are property, and are sufficiently designated by the name given to them in the indictment, which is a name in common use and everywhere understood. To have added a further allegation, stating by whom the notes were made or executed, would have been matter of unnecessary description.

7. The remaining averment of the same motion is to the effect that no offence is set forth as committed by the persons charged as accessories, because no offence is charged to which they could be accessory. Of this it is enough to say that, as matter of pleading, the indictment well charges the offence of corruptly giving to a municipal officer a gift to influence his action upon a question which by law might come before him in his official capacity.

8. The defendants contend that their conviction was wrong, because upon the evidence the notes alleged to have been given as a bribe were without consideration and void, and so of no value, and that it appeared that nothing of value was given. So far as this defence was hinted at in the motions to quash, it has already been considered. But it was distinctly raised upon the motions to order verdicts of not guilty, which were denied under exception, and in the requests for ruling or instructions to the jury and the exceptions to the charge. Assuming in favor of the defendants, without so deciding, that under our statutes it is essential for the prosecution to show that the gift or gratuity corruptly given is a thing of value, the question is whether upon the evidence the notes given in this instance were of value.

They were given only upon an illegal consideration, and could not be enforced by Lang against either of the promisors, if they should see fit to defend upon that ground. Edward R. Donovan, whose signature purported to be upon the face of the notes as maker, testified that he did not sign them; but if, as the jury might find from the evidence, he procured and incited and aided his brother to utter the notes as a gift to Lang, he might be as much bound by the actual signatures as if they were written by his own hand. Whether Edward R. Donovan was or was not in a position to contest the genuineness of his signatures, James C. Donovan himself signed his own name upon the back of each note before its delivery to Lang, and so stood as an original promisor upon each note. The notes were in form negotiable,

and were each payable at a future time, which would give to Lang the possibility of selling them for value before maturity to an innocent purchaser without notice.. They were delivered by James C. Donovan as a gift, and were accepted by Lang as a gift, so that the property in them passed from the donor to Lang. The allegation that each note was of the value of twenty-five dollars did not differ from the ordinary allegation of value in an indictment, and it was not necessary that it should be proved as laid, but only at most that the notes were of some value. *Commonwealth* v. *Hussey*, 111 Mass. 432. We think that it cannot be said, as matter of law, that negotiable promissory notes payable at a future time, delivered as a gift to the payee named in them by one who is an original party to them as one of two promisors, are of no value because the signature of the other promisor is a forgery and the only consideration an illegal one. Their delivery transfers to the donee the property in the notes as the promises of one at least of the promisors, enuring to the payee or to his order, and gives to the payee rights which he may lawfully exercise over the notes, and which may be of pecuniary advantage to him. They were good upon their face, and the jury might find them of value.

There is no statute declaring such notes void, as in the case of notes for money lost at gaming, and in Massachusetts the general rule is that one who takes a negotiable note for value in good faith before maturity, and without notice of any taint, may recover upon it notwithstanding the consideration was illegal. See *Williams* v. *Cheney*, 3 Gray, 215; *Cazet* v. *Field*, 9 Gray, 329; *Taylor* v. *Page*, 6 Allen, 86. The defendants rely upon the case of *State* v. *Walls*, 54 Ind. 561, where such a note was held absolutely void, but that our law is otherwise follows from the cases cited.

9. The defendant O'Connell contends that there was not sufficient evidence to warrant the jury in bringing in a verdict against him, and that a verdict of not guilty as to him should have been ordered; and he urges that there was no evidence connecting him with James C. Donovan, and no evidence of anything that he, O'Connell, did or said after leaving Lang's store in the forenoon, until the next day, when he tried to influence other councilmen, which he contends shows that he was not a party

to the bribing of Lang ; and he further relies upon his testimony that he had no communication with James C. Donovan after he himself left Lang's store in the morning, and upon the corroboration of this testimony by other witnesses, and also upon his own testimony that he had no knowledge until the afternoon of the next day that the notes were to be given or had been given.

The difficulty with this contention is that the jury were the judges of the evidence, and might believe or disbelieve so much of it as they saw fit. If they found it to be true that O'Connell, upon receiving from Lang at their first interview a plain intimation that Lang's assistance was to be obtained only upon a bribe, replied that that was all right, and arranged for another interview, at which Lang said distinctly that it would take a good deal of money to buy him, and that upon the assent of Edward R. Donovan to this proposition O'Connell took part in arranging for the interview between Lang and James C. Donovan, at which the amount and nature of the bribe were settled upon on the same afternoon, it might be a fair inference that O'Connell aided and counselled the whole transaction, especially if the jury, as they might, disbelieved his testimony, and that of the witnesses who corroborated it, to the effect that he had no communication with James C. Donovan, and did not know until the next day that the notes were to be given or had been given. The whole evidence was for the jury, and there are views of it on which the inference of O'Connell's guilt is not unreasonable.

10. No argument has been addressed to us upon several of the instructions requested and refused. It clearly was not necessary for the government to show that Lang in accepting the gift made any promise as to his future action or vote. See *Commonwealth* v. *Murray*, 135 Mass. 530. Nor was it a defence that James C. Donovan gave the notes believing them to be worthless. The instructions given upon the phase of the case presented by the contention that the transaction was a trap laid for the defendants were full and correct, and none of the defendants have argued their exceptions to them, or to the refusal to give in terms their requests addressed to the same aspect of the case. The same is to be said as to the request as to the weight to be given to the testimony of Lang.

11. The only remaining question for consideration is the contention, made upon the motion in arrest of judgment, that the verdicts of guilty upon the first count, and of not guilty upon the second and third counts, are inconsistent; that the jury have found in effect that Lang was not bribed either to refrain from voting or to vote " Nay " on the question of removal from office, and that in no other way could he act officially in favor of the appointee, and the defendants contend that the verdicts themselves show that the gift was not made to influence Lang's official action.

This is not the true view of the situation. The verdict of not guilty upon the second count does not establish it as a fact that the jury found that the gift was not made to influence Lang to vote " Nay " on the question of removal; but only that the charge made with that particularity was not proven. And so of the verdict of not guilty upon the third count, which alleged as another particular that the gift was to influence Lang to refrain from voting. That the proof did not satisfy the jury of either of these particulars is not inconsistent with its satisfying the jury that the gift was corruptly given to influence Lang's vote upon the question of removal, which is the offence prohibited by the statutes, and the whole offence charged in terms by the first count.

The result is, that we find no error in the action of the Superior Court as brought here either by the appeals or the bills of exceptions, and that the orders of that court overruling the defendants' motions, so far as appealed from, are affirmed, and the defendants' exceptions are overruled.

*So ordered.*