<hr />

COMMONWEALTH *vs.* EDWARD AVERY.

SAME *vs.* SAME.

SAME *vs.* SAME.

Norfolk.     October 3, 1938. — December 28, 1938.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, & DOLAN, JJ.

*Bribery.   Public Officer.   Evidence, Relevancy.*

On evidence that one seeking employment as physician for town welfare cases paid a sum of money to a selectman who accepted it with the understanding that the employment would be given for a year at a certain salary, that thereafter the physician received notice from the board of selectmen that he was so appointed, and that he served for a year on those terms, a conviction of the selectman of the crime first

alternately described in § 8 of G. L. (Ter. Ed.) c. 268 was warranted although in procuring the appointment he may have usurped powers which did not properly pertain to his office.

At the trial of an indictment against a selectman for accepting a bribe in violation of G. L. (Ter. Ed.) c. 268, § 8, evidence was admissible that the defendant, to force the performance of a promise to pay him money for the granting of a license, caused delay in payment of a sum of money due from a town to a member of the briber's family, and that, when the briber partly performed his promise, the defendant said in substance that he would "see that" the payment was made, and that the payment then was made.

Convictions were warranted on indictments charging a selectman of a town with soliciting and receiving bribes where the evidence showed that he privately in effect told persons seeking liquor licenses that licenses would be granted if they contributed "for campaign expenses," or made "political contribution"; that, in one case, after a promise of such a payment was made and a license issued, he held up a payment due a member of the briber's family until the promise was fulfilled, when he in substance said he would. cause release of the payment and that the payment then was released; while in another case he held up the issuance of the license until the "contribution" was made.

THREE INDICTMENTS, found and returned on April 8, 1938.

The indictment in each case charged the defendant, a member of the board of selectmen of the town of Braintree, with requesting and accepting a certain sum ($200 in the first case, $50 in the second case, and $100 in the third case), "a gift and a gratuity . . . under an agreement and with an understanding that" he "should give his vote, opinion and judgment in a particular manner and upon a particular side of a question, cause and proceeding, which was or might be by law brought before him in his official capacity and as a consideration for any speech, work and service in connection therewith . . ."

The indictments were heard by *Williams*, J., without a jury. The defendant was found guilty on each indictment, and alleged exceptions in all the cases to a refusal of the judge to find for him on all the evidence; and, in the second case, also to the admission of evidence described in the opinion.

*R. B. Owen*, for the defendant.

*E. R. Dewing*, District Attorney, for the Commonwealth.

Qua, J. These are three indictments under G. L. (Ter. Ed.) c. 268, § 8, charging the defendant with accepting bribes while he was a member of the board of selectmen of Braintree.

The material part of said § 8 reads as follows: "A legislative, executive, judicial, county or municipal officer who corruptly requests or accepts a gift or gratuity or a promise to make a gift or to do an act beneficial to him, under an agreement or with an understanding that his vote, opinion or judgment shall be given in any particular manner, or upon a particular side of any question, cause or proceeding, which is or may be by law brought before him in his official capacity or as a consideration for any speech, work or service in connection therewith, or that, in such capacity, he shall make any particular nomination or appointment, shall forfeit his office . . . and be punished by imprisonment in the state prison . . . ."

In the first case there was ample evidence that the defendant accepted $200 from one Pearlstein with the understanding that Pearlstein should be employed for a year "as physician for the town welfare cases" at a salary of $1,000; that within a week afterwards Pearlstein received notice of his appointment from the board of selectmen; and that he actually served for the year and received the stipulated salary. The defence now urged is that the employment of a "welfare physician" for a year at a fixed salary was not a matter which could "be by law brought before" the defendant "in his official capacity," as it is contended that the town had no power to employ such a physician at a salary; that if the town had such power, it should be exercised by the board of public welfare, and it did not appear in evidence that the selectmen constituted the board of public welfare in Braintree; and that even a board of public welfare could not make an executory contract performance of which would not be completed until long after the next town meeting, at which the personnel of the board might be changed.

This defence has a strange sound coming from a public officer who has received money upon the representation that

he could and would perform his part of such a bargain. The office of selectman is regarded by the public generally as the embodiment of the official authority of the town. In most towns election to that office is deemed a high honor. The duties of the office touch intimately practically all municipal activities. Unless the town votes otherwise, the selectmen constitute the board of public welfare. G. L. (Ter. Ed.) c. 41, §§ 20, 21, 31. They approve all bills and payrolls. § 52. They doubtless often exercise an influence upon the management of town affairs which cannot be measured by reference to any express statutory definitions. Plainly the judge could find, on evidence which need not be recited in greater detail, that the defendant used the real or supposed power of this office to obtain money for himself by a corrupt trade in violation of his public duty, and that under color of his office he exercised *de facto* the power needed to accomplish what he set out to do. In a situation of this kind there is present every element which renders the acceptance of a bribe abhorrent to all right thinking people. On principle, the facts being established, the defendant was properly found guilty. His offence is not excused or mitigated by the fact, if it be a fact, that he usurped powers which did not properly pertain to his office.

We think there is nothing in the wording of § 8 hereinbefore quoted which should lead to a different conclusion. The clause "which is or may be by law brought before him in his official capacity" as a matter of syntax relates only to "question, cause or proceeding." It does not qualify that part of the section which precedes the words "in any particular manner." The attempt to make it do so interrupts the even flow of the sentence. The conviction can rest upon the first four and a half lines of the section down to and including the word "manner," in conjunction with the penal clause. The alternatives following the word "manner" may be disregarded as inapplicable.

We do not mean to say that an officer can be convicted of bribery in respect to acts entirely unrelated to his office. But where as here he acts under color of his office we think that a sufficient relation exists. In *Commonwealth* v.

*Donovan*, 170 Mass. 228, at page 238, this court held that a city councilman would act "in his official capacity" as those words are used in what is now the immediately preceding section (G. L. [Ter. Ed.] c. 268, § 7), if he voted to remove a person claiming to be city treasurer, although the person's appointment to that office was invalid. See *Commonwealth* v. *Lapham*, 156 Mass. 480, 484. One who is merely an officer *de facto* may be convicted under § 8. *Commonwealth* v. *Wotton*, 201 Mass. 81, 84.

We are aware that there are numerous decisions in other jurisdictions under varying statutes which construe the requirements to prove guilt of bribery more narrowly and technically than we are disposed to construe them. *State* v. *Butler*, 178 Mo. 272, is an illustrative case and cites many others. There is, however, other authority substantially in accord with the views which we have here expressed. *Fall* v. *United States*, 49 Fed. (2d) 506, certiorari denied, 283 U. S. 867. *People* v. *Anderson*, 75 Cal. App. 365, 372–374. *York* v. *State*, 42 Ga. App. 453, 461, 462, affirmed, 172 Ga. 483. *State* v. *Potts*, 78 Iowa, 656, 658. *State* v. *Campbell*, 73 Kans. 688, 713. *State* v. *Ellis*, 4 Vroom, 102. *People* v. *Clougher*, 246 N. Y. 106, 111–112. *People* v. *Lafaro*, 250 N. Y. 336, 342. *Roberts* v. *State*, 45 Ohio App. 65. *Commonwealth* v. *O'Brien*, 107 Pa. Super. Ct. 569, 574–577.

In the second case there was evidence of these facts: In December, 1934, one Wilson filed an application for a package store license. Wilson saw the defendant in the presence of another selectman and asked for a license, but the defendant gave no definite answer. Later Wilson called the defendant on the telephone, and the defendant said, "Why don't you come up to the hall and see me?" Wilson went to the selectmen's office, where the defendant took him into a private room, no one else being present and the door being closed, and told him that he could have the license, and said that "he [the defendant] was asking everybody to contribute $100 for campaign expenses." Wilson said that he could not pay just then, as he had "quite an expense," but that he would pay "later on."

The defendant said that would be all right. The license was granted December 21. Wilson paid a license fee of $200. The town, at a meeting in the following March, voted to pay $200 to Wilson's mother-in-law, to compensate her for the use of her land for depositing refuse and other material. The defendant had put an article relative to this in the warrant for the meeting, and he spoke in favor of it at the meeting. Wilson made two demands upon the treasurer for payment of this money, but it was not paid. The warrant for payment required the approval of the selectmen. The defendant testified that he and one other were "the majority members," and that the money for the use of the land was not paid from March until November. In November Wilson saw the defendant alone at the town hall. He brought the defendant $50 in cash, told the defendant that that was all he (Wilson) could spare just then and promised to give him "fifty more" after the first of the year. The defendant said "it was all right." No receipt was given. The defendant then also said, referring to the check for the use of the land, "I will see that the check goes through now all right. It will go through all right now. You will get your check." In a week or ten days after that "the check came through to the family." The last indorsement on it was that of Wilson's wife. The defendant himself in the latter part of November handed the "bill" for this payment to the secretary of the selectmen and gave the final instruction for the making out of the wrapper on the voucher. The voucher itself was dated in August. The check was dated November 22. The defendant testified that he never talked with Wilson regarding the payment by Wilson of any money; that he received no money from Wilson; that he did nothing to hold up the payment of the $200; and that Wilson was "one of his political lieutenants."

On this evidence the judge could find that the $50 was a bribe which the defendant requested and accepted for Wilson's liquor license, and that when Wilson did not pay the agreed sum the defendant caused the $200 check to be withheld until the $50 was paid. There was no error in

admitting the evidence relative to the $200 payment, as that evidence had a bearing upon the issue.

In the third case there was evidence to this effect: Early in December, 1934, one Tyson, who also had filed with the selectmen an application for a liquor license, interviewed the defendant alone with the door closed, and the defendant said that "all the others were making political contributions," and it was about time that Tyson made one, and "to get it up there before the license should issue." After the licenses were issued, Tyson, having received no notice from the board, went to the town hall in the latter part of December, saw the defendant, and asked if the licenses were ready. The defendant said, "Yes," but that he wanted to see Tyson first. They then talked in the inside office. The defendant asked if Tyson had the money. Tyson gave the defendant $100 in cash, and at that time the defendant said, "Your license is O. K. You can get it any time now." He told the secretary to give Tyson his license, and after Tyson had paid the license fee she did so. The defendant denied having had any talk with Tyson in regard to the payment of money in connection with a license or that Tyson came to see him at all about his license in December, 1934. This evidence warranted a finding that the defendant requested and accepted from Tyson a bribe of $100 for Tyson's liquor license.

In each case the entry will be

*Exceptions overruled.*