COMMONWEALTH *vs.* THOMAS F. GALVIN & another.

Essex.    January 5, 1942. — January 28, 1942.

Present: FIELD, C.J., QUA, DOLAN, & RONAN, JJ.

*Conspiracy. Bribery. Pleading, Criminal,* Indictment. *Evidence,* Conspirator, Competency, Corroborative, Relevancy and materiality, Conflicting statements of witness. *Witness,* Redirect examination, Self-incrimination, Contradiction. *Practice, Criminal,* Discretionary control of evidence. *Constitutional Law,* Waiver of constitutional rights.

An allegation in an indictment that a person was unknown to the grand jury must be taken to be true in the absence of any evidence to the contrary.

Evidence warranted a finding that a municipal officer having the power to appoint policemen and firemen, and an attorney with whom he was intimate politically and socially conspired to request and accept bribes from certain applicants for appointment to the police and fire forces who received their appointments after paying money to the attorney.

If there is evidence warranting a finding that one joined in a conspiracy, his acts and declarations during the conspiracy are admissible against his fellow conspirators at the trial of an indictment in which they, but not he, are the defendants.

Testimony may be admitted on redirect examination of a witness for the Commonwealth at a criminal trial to explain, correct or modify his testimony on cross-examination.

After a witness for the Commonwealth at a criminal trial had testified that he had paid money to the defendant and had refreshed his recollection of the date of payment by referring to his bank book, further testimony that he had the book with him was admissible in the discretion of the judge to corroborate his previous testimony.

The extent to which a witness on redirect examination may be allowed to testify as to matters not covered by his cross-examination is within the discretion of the judge.

In cross-examination of the defendant at a criminal trial, there was no error in eliciting from him that at a hearing before a public commission as to a matter relevant to the issue on trial he had refused to answer certain questions on the grounds that his answers might tend to incriminate him and also that the commission had no authority to conduct such hearing; whether the commission was or was not acting within its authority was immaterial.

Testimony by a witness at a criminal trial might be contradicted by evidence of a statement made by him to the grand jury which returned the indictment.

Two INDICTMENTS found and returned on November 26, 1940.

The indictments were tried before *Forte,* J.

*R. L. Sisk,* (*J. W. McManus* with him,) for the defendants.

*W. F. Hayes,* Assistant Attorney General, (*F. G. Volpe,* Assistant Attorney General, with him,) for the Commonwealth.

DOLAN, J. These are two indictments against Thomas F. Galvin, at the time of the trial an alderman and commissioner of public safety of the city of Lawrence, and William P. Reilley for conspiring together to request and accept bribes from applicants for positions as policemen and firemen in the city of Lawrence in violation of G. L. (Ter. Ed.) c. 268, § 8. The defendants pleaded not guilty and were tried together on both indictments. They were found guilty on both indictments, sentenced, and committed, and the case comes before this court on their bill of exceptions.

The first indictment contains a single count charging the defendants with conspiring together to solicit and accept bribes from unknown persons "under an agreement and with an understanding that the vote, opinion and judgment of the said Thomas F. Galvin, a municipal officer, to wit, Alderman and Commissioner of Public Safety of the City of Lawrence, should be given in a particular manner and upon a particular side of a question cause, or proceeding which was then pending and which might by law come or be brought before him, the said Thomas F. Galvin, in his official capacity," and that in that capacity "he, the

said Thomas F. Galvin should make a particular nomination and appointment." The second indictment, containing two counts, charges the defendants with the same offence, naming Charles J. Keenan in the first count and Oscar E. Hilbert in the second as the persons from whom the bribes were to be solicited and accepted.

At the close of the evidence the defendants moved to expunge all evidence of their acts and declarations prior to February 1, 1938, on the ground that the persons alleged to be unknown in the first indictment were actually known to the grand jury when the indictment was returned. The denial of this motion is the basis of the defendants' first exception. They contend that the persons alleged to be unknown to the grand jury were actually known to them, and that there is a variance between the allegation and the proof which vitiates the indictment, and, therefore, that under their general motion for a directed verdict the defendants were entitled to have a verdict of not guilty ordered to be returned on this indictment.

It has been held that in such circumstances a variance of this nature vitiates the indictment, but the cases in which it has been held that the falsity of an allegation that a person was unknown to the grand jury was material have been those in which there was evidence, apparently introduced without objection, that went to establish such falsity and thereby to make out a variance between allegation and proof. *Commonwealth* v. *Merrick*, 255 Mass. 510, 513, and cases cited. (But see G. L. [Ter. Ed.] c. 277, § 35.) In the absence of any evidence to the contrary the assertion of the grand jury that the alleged applicants were unknown may be presumed to be true. *Commonwealth* v. *Thornton*, 14 Gray, 41. *Commonwealth* v. *Gedzium*, 259 Mass. 453, 458. In the present case there was no evidence to the contrary. The defendants' first exception is overruled.

The defendants' second exception is to the denial of their motion for a directed verdict of not guilty on each indictment. They contend that the evidence was not sufficient to warrant the jury in finding them guilty of the crimes charged.

There was evidence that the defendant Galvin was duly elected an alderman of the city of Lawrence on December 8, 1931, for a period of two years, commencing on the first Monday of January, 1932; that he was reëlected at succeeding elections and held that office continuously up to and through the time of the trial. By virtue of his election as alderman he became commissioner of public safety with power to appoint and remove policemen and firemen in the city.

There was also evidence that the defendant Reilley, an attorney at law, was admitted to the bar in 1930 and had been interested and active in the political career of the defendant Galvin since the fall of 1931; that he had been connected with Galvin in all of his campaigns since that time, presided as chairman at some of the meetings held in his behalf, was chairman of his campaign committees for the years 1931, 1933, 1935, 1937, and 1939, and considered himself one of Galvin's principal campaign workers; that, in addition to this political association, the defendants were intimate socially and for nine years prior to the trial had lunched together every day, although Galvin had no private business to discuss with Reilley as a lawyer; and that at these luncheon meetings "Bart" Galvin, a younger brother of the defendant Galvin, contended by the Commonwealth to have been a member of the conspiracy, but who was not indicted, was frequently present.

Fred Atkinson, a witness for the Commonwealth, testified that he talked with the defendant Galvin in May, 1937, about an appointment as a regular police officer "when a vacancy occurred"; and that Galvin said that he (Atkinson) had been against him (Galvin) politically. The witness further testified that when a vacancy occurred he was not appointed; that thereafter, when a second vacancy occurred, he went to see Reilley and told him that it was about time he got a job after eleven years on the reserve list; that Reilley asked, "Is it worth a grand"; that he arranged with Reilley to pay him a few days later, paid him $1,000 on June 8, 1937, and was appointed as a regular officer on August 8, 1937.

Charles Poole testified that he was appointed a regular police officer on May 9, 1937, after having been certified on three previous occasions; that he went to see Reilley on April 2, 1937, in consequence of a telephone conversation with "Bart" Galvin, who told him that he was the next to be appointed and to "Go up and see" Reilley; that he told Reilley what "Bart" Galvin had said; that Reilley said, "You know, it costs money to run campaigns"; that he (Poole) said, "What is my share"; that Reilley said, "A 'thou' . . ."; that he told Reilley that he did not have $1,000 and did not know where he could get it; that he paid the sum of $1,000 to Reilley in instalments; that he made a payment of $100 to Reilley on April 5 or April 6, 1937; that he received the next appointment to the police department on May 9, 1937, after he had seen Reilley; that each time he made a payment to Reilley the latter would take out the "slip of paper," which he (Poole) had signed at the time of his first visit to him, and write "on the back of it." Poole further testified that in February, 1939, he got into some difficulties while a police officer; that the defendant Galvin threatened to suspend him; that he told Galvin he could not afford a suspension; that Galvin asked him what he was doing with his money, and he told him "he was paying $10 a week to the Morris Plan for money he gave to Reilley for his job"; and that Galvin said, "I didn't get it." The defendants duly excepted to the admission of that part of this evidence relating to the acts and declarations of "Bart" Galvin.

Oscar E. Hilbert testified that he had twelve or fifteen conversations with the defendant Galvin with relation to obtaining an appointment as a reserve officer and that shortly before his appointment Galvin said, "You are not dense are you"; that he replied, "No"; that Galvin said, "Go up and see Bill Reilley"; that about three weeks before his appointment he went to see Reilley, told him of his talk with Galvin and that he was "sent up by Galvin"; that Reilley said that he would see what he could do for him; that some time after that he (Hilbert) received a "requisition" from the civil service department, and went

to see Reilley who said to him, "Now that you have your requisition how about a couple of hundred"; that he replied, "All right, I will get the two hundred"; that he got $200 and gave it to Reilley on July 1, 1938; and that he was appointed a reserve officer on July 5 following.

Charles J. Keenan, another witness for the Commonwealth, testified that he talked with the defendant Galvin in January, 1938; that Galvin told him to "Go to see Reilley . . ."; that he saw Reilley a day or so "afterward" and told him Galvin had sent him; that Reilley told him not to get upset, that he would hear from him; that Reilley sent for him later, told him that "another fellow [was] putting on pressure to be appointed," and said, "If you can get $200 the job is yours"; that on January 27 or 28 he paid Reilley $200; that he learned within an hour or so after paying the money that he had been appointed, and received notice of his appointment from the defendant Galvin the following week. In the course of cross-examination he testified that he had talked with a representative in the Legislature about having the civil service law changed. On redirect examination he was asked when this talk took place and replied, "for the first time in January of 1940." He was then asked, "What was your purpose in that," and replied, "So that you would not have to pay for the job." This question and answer were admitted over the objections, and subject to the exceptions, of the defendants.

Timothy J. Donovan testified that he was appointed a reserve fireman on December 30, 1931; that he, with others, was removed by the defendant Galvin on February 12, 1932, for reasons of economy; that he was introduced to Reilley by a common friend on or about January 7, 1935; that he talked with Reilley about obtaining a reappointment; that he left his sister's telephone number with Reilley, and about a week later "received a call" and went to see Reilley; that he asked Reilley what his chances were; that Reilley replied, "You are all set. Have you got $200"; that he, Donovan, said, "I think so"; and that on the following day he paid Reilley $200. In cross-

examination he testified that he denied before the civil service commission while under oath that he had paid Reilley any money; that his "job" (in "Norfolk Prison Colony") was in jeopardy.

Martin J. Clark, called by the Commonwealth, testified that he was appointed a reserve policeman on December 23, 1929, and a "regular" on February 6, 1938; that in the summer of 1937 he talked with the defendant Galvin, who said to him that the witness had always been opposed to him politically; that two or three weeks before his appointment he talked again with Galvin; that between these two "talks" he saw Reilley, in September or October, 1937; and that on January 1, 1938, he saw Galvin again, who told him, "Your chances are as good as anybody's." The witness further testified that about January 23 or 24, 1938, he saw "Bart" Galvin and talked with him about his chances of getting an appointment; that "Bart" Galvin said, "Campaigns cost money. Would you like to make a little contribution"; that he replied, "Yes, How much"; that "Bart" Galvin said, "A grand"; that he, Clark, said that he did not know where he could get it; that "Bart" Galvin said, "See Bill Reilley"; that the following day "he got together" $1,000 and gave it to Reilley saying, "Here is the contribution Bart Galvin spoke about"; that Reilley said, "It will help a lot, it will take us out of the red . . . I think you will be all set." At this point (and later in his charge) the judge instructed the jury that this testimony could be considered by the jury only if they found that "Bart" Galvin was a "part" of the conspiracy, "and only under those circumstances." This evidence of his acts and declarations had been admitted subject to the defendants' exceptions. The witness further testified that he received notice of his appointment two days after paying Reilley the $1,000, and that he saw a notice of his appointment on the bulletin of a local paper on January 29, 1938. He further testified that he had refreshed his recollection as to the date when he paid Reilley $1,000 by looking at his bank book "that morning before he came to court." Subject to the defendants' exception he was permitted to

testify that he had the bank book with him and that it stood in his name and that of his wife.

On cross-examination this witness testified that he was willing to pay the $1,000 in order to get a preference; that he did not tell anyone about paying for his job "until he went to the civil service commission"; that he denied there under oath and also when not under oath that he had paid for his job; that he had been to Mr. Lupien's (the civil service commissioner's) house in Lowell and "denied to him" that he paid for the job; that at a second hearing before the civil service commission he denied, and then later admitted, paying for the job, and stated his reasons for the previous denials. On redirect examination the Commonwealth was permitted, subject to the defendants' exceptions, to interrogate the witness with respect to whether he went voluntarily to Mr. Lupien's house, to which he answered, "Yes," whether he went there with any desire to make any complaint, to which he responded, "No" — that he went there "to find out," that he understood that "something was said . . . concerning" him, and that he told Mr. Lupien he had not paid for the job because he did not want to become involved in anything at all. Subject to the defendants' exceptions he was also permitted to testify, in answer to a question whether he was a witness "because . . . [he] wanted to be here or because . . . [he was] served with a summons," that he was present under summons, and further, in response to a question by the prosecuting attorney, that "While there was a campaign on . . ." there was no suggestion made about a campaign contribution.

Martin Handley, a witness called by the Commonwealth, testified in substance that prior to his appointment in October or November, 1938, he talked with Galvin; that he talked with Reilley first in 1936, and thereafter two or three times in the year and a half following; that no appointments were discussed; that on December 15, 1938, he drew $200 from the bank and went to see Reilley; that Reilley said, "You are the fellow I have been looking for"; that he (Handley) said, "What is the story"; that Reilley

asked him if he had contributed to the campaign, and he replied, "No"; that Reilley said, "How about two hundred," and the witness replied, "That's entirely up to you. You know more about it than I"; that Reilley told him he wanted it paid before the end of the week, because the appointments were going to be made during the week-end. Subject to the defendants' exceptions the witness was permitted to testify that he got $200 and gave it to Reilley the same day (December 15, 1938). He further testified that he received a notice from the civil service commission on December 24, 1938, and learned of his appointment on that day. On redirect examination, he further testified that he understood that $200 was for the campaign; that he had Reilley's word for it; "that this amount was necessary, although there was no campaign that year, the campaign having been in the year previous."

Charles F. Hart, Jr., called by the Commonwealth, testified that in 1936 he saw the defendant Galvin and, after receiving a notice from the civil service commission, asked him about an appointment, stating that he was first on the list; that Galvin said he would consider him; that the next morning a man came to his door and had a conversation with him, as a result of which he went to the office of Reilley and told him that he was interested in getting an appointment to the police department; that Reilley discussed family relations, campaign expenses, and other topics; that the following day he received a telephone call, and as a result "went back" to Reilley's office and saw him and said to him, "Evidently we did not get together yesterday . . . How much," and Reilley said, $200; that he then paid Reilley $200 "which he had in his pocket"; that he paid the money to get the job; and that he was appointed a reserve officer on May 30, 1937. He testified on cross-examination that he attended a meeting with other men held in the home of Ernest F. Hart for the purpose of putting a stop to the selling of jobs. On redirect examination the witness testified that he was one of a group that had been formed to stop the buying and selling of jobs. He

was then asked, "Why didn't you have another meeting," and was permitted, over the defendants' objections and exceptions, to testify that they did not have another meeting because they "were fairly certain that Commissioner Galvin knew about it; that it was carried back to him by one of the men."

The testimony of Edward J. Hayes, called by the Commonwealth, may be summarized as follows: He was actively interested in the defendant Galvin's campaign in the fall of 1937. He saw Reilley and the latter told him he was doing good work politically for Galvin. He saw Reilley again and the latter told him that he had seen the "Commissioner" about him. During the campaign (October, 1937) he gave $100 to "Bart" Galvin "to put into the campaign." On June 3, 1938, as a result of a telephone call from "Bart" Galvin to the witness's father, the witness went to see "Bart" Galvin at his office, and the latter told him there was a vacancy, and an appointment pending, that the usual fee was $200, and that "he would have to get it by eleven o'clock the next day or the appointment would go to someone else." The witness told "Bart" Galvin that he did not have $200, whereupon "Bart" Galvin said, "If you haven't then we will have to pick someone else off the list"; and that then the witness said, "If I do get it where shall I bring it," and "Bart" said, "Here to me or to Bill Reilley." The witness then said to "Bart" that he had thrown $100 into the campaign and, in substance, that he had worked day and night through the campaign, and "Bart" said, "All right, we will knock off $100." On the following day, June 4, 1938, the witness got the $100 and "brought it up to Reilley and threw it on . . . [his] desk" and said, "Bart sent me over." Reilley did not say anything. This occurred at ten o'clock in the morning and at 12:45 P.M. the witness heard the announcement of his appointment on the radio. The record does not disclose that any exception to the testimony of this witness was saved.

William J. Casey, called by the Commonwealth, testified in substance that he talked with Reilley on May 5, 1938;

that he asked him about getting an appointment as a permanent patrolman; that Reilley said there was nothing he could do, for him to see his friends and send them to the defendant Galvin to intercede for him; that he saw Galvin on May 6 or 7 and said a new appointment was coming up and that he would like the job, and Galvin said he did not know what he was going to do about it; that he saw Reilley on December 14, 1938, and said, "Please tell me what is the inside story"; that Reilley said, "You have got to make a contribution, a gift. The gift will be $1,500"; and that he (Casey) said, "I will do the best I can to raise it." The witness further testified, subject to the defendants' exceptions, that as a result he went to the Morris Plan Bank on December 15, 1938, and got $1,375, "the amount you get on a $1,500 loan . . . ." He further testified that he gave Reilley $1,500 the same day; that Reilley said he was expecting him and he counted the money; that he (Casey) said to Reilley, "It will be a grind to pay that off. I hope I get the job"; that Reilley said, "Don't worry, everything will be O. K."; that after seeing Reilley he went to the city hall and saw the defendant Galvin, who said, "I am going to make an appointment today or the first of the year. I want to congratulate you! You will be the next appointee"; that he had paid the money at 11:20 A.M. and that at 1:45 P.M. the same day he heard his appointment broadcast over the radio.

Ernest J. Mills, called by the Commonwealth, testified in substance that he was appointed a reserve fireman in 1934; that about August 1, 1939, he saw Galvin and asked him to consider him for an appointment as a regular fireman; that he saw Reilley about a week later and again on August 15, 1939; that Reilley said he would help him "to get appointed"; that he had an envelope with $500 in it, and said to Reilley, "Take that and put it into the campaign. That is the best I can do"; that he asked Reilley, "How is it," and he replied, "better"; that he (Mills) said, "What do you mean by better," and Reilley said, "Much better." The witness was then asked, "What did you do then." The defendants objected and subject to their ex-

ceptions the witness was permitted to testify in response that he went and got $200 and gave it to Reilley on August 29, 1939, and that six months later he was appointed. (February 11, 1940.) In cross-examination he testified that he had appeared before the civil service commission twice and that on the first occasion he had denied paying for his job, explaining that the money which had been traced to him had been used in part to buy his wife a fur coat "and the rest for his home." On redirect examination, subject to the defendants' exceptions, he was permitted to testify that the reason he told the civil service commission he did not pay for his job was that he did not "want to get mixed up in it," and that he changed his testimony the second time he appeared before the commission because he was worried and did not know what would happen to him if he kept on lying, and so he "told the truth."

Ernest F. Hart, the last witness for the Commonwealth, testified, in substance, that he talked with the defendant Galvin in the latter part of 1934, with reference to being appointed a policeman; that Galvin said that he (Galvin) would "have to get together with Bill Reilley soon"; that subsequently he talked with the latter over the telephone and that Reilley said, "I want to see you right now"; that he met Reilley by appointment; that he asked Reilley "What's the good news? Is Tom (meaning the defendant Galvin) going to make some appointments"; that Reilley said, "Can you get hold of a couple hundred dollars"; that he asked Reilley, "Are all the fellows going to pay," and Reilley said, "Yes"; that he (the witness) said he would go to the bank and borrow the money, and Reilley said, "No, get it from your friends"; that he paid $200 to Reilley that night; that Reilley said the appointment would be made in a couple of weeks; and that he was appointed (a reserve policeman) on December 28, 1934, effective January 13, 1935. In cross-examination the witness testified as to a meeting held at his home and to another meeting at the home of the witness Keenan, naming the persons who were present, and that the talk "just centered around one issue, that of job selling." On redirect examination the

defendants excepted to the admission of certain testimony in relation to meetings at the witnesses' homes. This testimony was no more in effect than a reiteration of the witness's testimony on cross-examination with relation to the meeting at his home, except that the names of some persons were given as present to whom the witness had not referred on cross-examination.

The defendant Reilley testified in his own behalf. No useful purpose would be served by a full recital of his testimony. Exceptions taken by the defendants to the admission of certain evidence · in the course of Reilley's cross-examination will be considered hereinafter.

There was no error in the denial of the defendants' motions for directed verdicts. The evidence was sufficient to warrant a finding that the defendants were guilty of conspiracy as charged in each indictment. The intimate association of the defendants; the short delays by Reilley in most instances before receiving payments from and assuring witnesses of appointment, warranting an inference of consultation by Reilley in the meantime with Galvin; the latter's action in sending applicants to Reilley; the payments of money to Reilley and the almost concomitant appointments in several instances, would warrant the jury in finding that each defendant knew what the other was doing and that the defendants were working in concert in the formation and execution of the conspiracy charged. The jury could also properly find on the evidence that the moneys paid by the witnesses to Reilley were paid as bribes and not as contributions to a campaign fund, that in most instances they were paid when in fact no campaign by Galvin for election was pending — in years when no election was in fact held — and that the talk of campaign contributions by Reilley and "Bart" Galvin was but a subterfuge. *Commonwealth* v. *Avery,* 301 Mass. 605, 611. The jury could further find that in some instances the money was paid without any reference to contribution to a political campaign. A conspiracy may be proved by circumstantial evidence of concerted action toward the accomplishment of a common purpose. *Attorney General* v. *Tufts,* 239 Mass.

458, 493, 494. *Commonwealth* v. *Farese*, 265 Mass. 377, 380. The recital of evidence hereinbefore set forth is sufficient without further discussion to demonstrate that it would warrant the jury in finding that the defendants combined by concerted action to accomplish the criminal and unlawful purpose charged.

The question remains whether the record discloses any reversible error in connection with the admission of certain evidence to which the defendants excepted.

The defendants' third exception relates to the admissibility of evidence of the acts and declarations of the defendant Galvin's brother, "Bart." There was no error in the admission of that evidence. The acts and declarations of a conspirator are admissible against his coconspirators, and may be considered by the jury even though the former is not indicted, if there is evidence to show that he had joined in the conspiracy. *Commonwealth* v. *Scott*, 123 Mass. 222, 236. *Commonwealth* v. *Stuart*, 207 Mass. 563. *Commonwealth* v. *Dyer*, 243 Mass. 472, 506. In the instant case there was evidence to show that "Bart" Galvin was a brother of the defendant Galvin, that he ate lunch with both defendants frequently; that he telephoned to the witness Poole and told him that he was the next to be appointed and for him to see Reilley; that Poole saw Reilley, paid him $100 on April 5 or April 6, 1937, was appointed on May 9, 1937, and made subsequent payments to him; that on January 23 or 24, 1938, "Bart" Galvin asked the witness Clark for a contribution of $1,000, that he sent him to see Reilley, that Clark saw Reilley, paid him $1,000 and got notice of his appointment two days later; that "Bart" Galvin sent for the witness Hayes on June 3, 1938, and told him that there was a vacancy, that the usual fee was $200 and that he "knocked off" $100 because Hayes had contributed that amount to the defendant Galvin's campaign in October, 1937; that "Bart" told Hayes to bring the money to him or Reilley; that Hayes took the money to Reilley on June 4, 1938; and that within three hours after giving him the money his appointment was broadcast over the radio. It seems clear that this evidence was suffi-

cient to show that "Bart" Galvin had joined in the conspiracy in question and was properly admitted.

The defendants' fourth, seventh, eighth, ninth, tenth, fifteenth and sixteenth exceptions relate to the admission of certain testimony of the witnesses Keenan, Clark, Mills and E. F. Hart on redirect examination. In each instance, the evidence to which these exceptions relate was admissible to explain, correct or modify the evidence elicited from these witnesses on cross-examination by the defendants. *Rumrill* v. *Ash*, 169 Mass. 341, 346, 347. *Mahoney* v. *Gooch*, 246 Mass. 567, 570. *Commonwealth* v. *Klosek*, 262 Mass. 416, 420. These exceptions are overruled.

The defendants' fifth and sixth exceptions relate to the admission of certain testimony of the witness Clark. Without objection Clark had testified in direct examination that his memory had been refreshed before coming into court, as to the date on which he paid Reilley $1,000, by referring to his bank book. Subject to the defendants' exceptions he was then permitted, as already set forth, to testify that he had the bank book with him and that it stood in his name and in that of his wife. The defendants argue that "the effect of producing" the bank book in answer to the question whether he had it with him was prejudicial to them. There is nothing, however, in the record to show that the bank book was in fact produced or admitted in evidence. We are of opinion that this evidence was admissible within the rule that a trial judge may in his discretion allow a witness to testify to facts and circumstances corroborative of his testimony. *Higgins* v. *Andrews*, 121 Mass. 293. *McCooe* v. *Dighton, Somerset, & Swansea Street Railway*, 173 Mass. 117, 118, and cases cited. *Tobin* v. *Brimfield*, 182 Mass. 117, 120. *Nelson* v. *Hamlin*, 258 Mass. 331, 341. The present case is distinguishable from cases where memoranda used to refresh the recollection of a witness were put in evidence. See *Krupp* v. *Craig*, 247 Mass. 273, 276; *Soja* v. *Fligier*, 261 Mass. 35, 36; *McKenna* v. *Fielding*, 272 Mass. 341, 344, 345. (See, also, however, *Commonwealth* v. *Lavery*, 255 Mass. 327, 331.) These exceptions, and for the same reasons the defendants' thirteenth exception to

testimony by the witness Casey, hereinbefore set forth, in respect to having obtained $1,375 from the Morris Plan Bank with which to pay Reilley in part, are overruled.

The defendants' twelfth exception to certain testimony of Charles F. Hart, Jr., hereinbefore set forth, cannot be sustained. "The extent to which re-examination of a witness may be carried with reference to matters not testified to on cross-examination is within the discretion of the court." *Sullivan* v. *Brabason*, 264 Mass. 276, 285.

The defendants' eleventh and fourteenth exceptions are disposed of by what we have said concerning the defendants' exceptions to the denial of their motions for directed verdicts, and cannot be sustained.

The defendants' seventeenth exception relates to testimony elicited from Reilley on cross-examination, to the effect that, at a hearing before the civil service commission, he refused to answer the question whether Galvin's return of receipts and expenditures during his 1937 campaign (which set forth no receipts) was a true statement, on the grounds that the commission had no authority to conduct the examination with reference to firemen and policemen and that to answer this and other questions put to him might tend to incriminate him. The defendants contend that the commission was without authority to conduct the examination in question because the commission was acting "contrary to law," and that Reilley properly declined to answer, and that they "should not be prejudiced because of Reilley's attempt to prevent an unlawful invasion of his rights." The evidence was admitted properly. It is well settled that a defendant in a criminal case who (like Reilley in the present case) voluntarily becomes a witness in his own behalf waives his constitutional protection, at least to a certain extent, and that he may be cross-examined like other witnesses as to all incriminating circumstances and as to whatever he has said or done which is relevant. ". . . he must testify to whatsoever has a legitimate bearing upon the question of his guilt." *Commonwealth* v. *Smith*, 163 Mass. 411, 431, et seq. It is immaterial whether the examination by the civil service commission, at which

Reilley claimed his privilege, was one within or without its authority.

The defendants' eighteenth and nineteenth exceptions, to the admission of testimony tending to show a statement made by Reilley to the grand jury contradictory to one made by him on direct examination at the trial, are overruled. This evidence was admissible for the purpose of contradicting him and to impeach his testimony. *Langan* v. *Pianowski,* 307 Mass. 149, 151, 152, and cases cited.

*Exceptions overruled.*